MARGARET A. ZIEGERT, Plaintiff-Appellant, *v.* SOUTH CHICAGO
COMMUNITY HOSPITAL *et al.*, Defendants-Appellees.

First District (1st Division)    No. 80-2911

Opinion filed August 3, 1981.—Rehearing denied September 8, 1981.

Michael J. McArdle, Chartered, of Chicago, for appellant.

Cassiday, Schade & Gloor, of Chicago (Rudolf G. Schade, Jr., and Richard A. Barrett, Jr., of counsel), for appellee South Chicago Community Hospital.

Wildman, Harrold, Allen & Dixon, of Chicago (Barry G. Bollinger and Ruth E. Van Demark, of counsel), for appellee Gonzalo Magsaysay, M.D.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

Margaret A. Ziegert (plaintiff) filed this action for medical malpractice against the South Chicago Community Hospital (Hospital) and Dr. Gonzalo Magsaysay (defendants). A jury returned a general verdict in favor of defendants. Plaintiff appeals.

Plaintiff was employed as a clerical coordinator at the Hospital in November 1973. She enrolled in the first semester of nursing school. She was acquainted with Dr. Magsaysay, a staff physician who specialized in surgery. They had several conversations regarding plaintiff's varicose veins and the possibility of corrective surgery. Plaintiff agreed to such surgery by Dr. Magsaysay.

Approximately one week prior to surgery, Dr. Magsaysay personally took a general medical history from plaintiff including her allergies and previous hospitalization. After preoperative tests, plaintiff was admitted to the Hospital on December 16, 1973. She was given a computer form upon which she detailed her prior medical history. An intern went over this history with her to check it for accuracy. Plaintiff was tendered and signed a consent form. Additional preoperative testing remains a subject of controversy.

The surgery, known as bilateral greater and lesser saphenous vein stripping, was performed on December 17, 1973. "Saphenous" relates to the two chief superficial veins of the leg. Plaintiff does not claim negligence by either defendant as regards the actual procedure. Medical records state plaintiff was removed to the nursing unit following surgery. Dr. Magsaysay prescribed tetracycline, an antibiotic.

Plaintiff made no complaints on December 18, 1973, other than the "usual postoperative pain." On December 19, plaintiff showed an elevated temperature and complained of chest and leg pain and heaviness. Dr.

Magsaysay also noted a positive Homan's sign. This is a pain or discomfort behind the knee generally associated with a thrombosis or blood clot in the leg. The doctor diagnosed her condition as a possible pulmonary embolism or obstruction of a pulmonary vein. He ordered heparin, an anticoagulant drug. A pulmonary scan was also ordered.

On December 20, Dr. Magsaysay noted a reduction in calf tenderness and chest pain. Results of the pulmonary scan were normal. An electrocardiogram (EKG) examination revealed "right ventricular strain," but was noted to be normal. Percodan, a pain medication containing aspirin, was prescribed by Dr. Magsaysay. He permitted plaintiff to have bathroom privileges. Later that evening, plaintiff's pain increased. She was given additional pain medication and oxygen.

On December 21, plaintiff was noted to be pale but with a regular pulse. She complained of heavy chest pain. Heparin treatment was discontinued and a chest X ray was ordered. Additional pain medication was prescribed.

On December 22, plaintiff again reported chest and leg pain. After a consultation with Dr. Magsaysay, heparin treatment was reinstituted. An EKG again revealed right ventricular strain. A possible pulmonary embolism remained Dr. Magsaysay's prime concern.

On December 23, plaintiff was reported to be pale. Massive swelling of her legs was noted and diagnosed as a result of internal bleeding. Heparin treatment was discontinued. Plaintiff was given blood transfusions and was transferred to the intensive care unit. Dr. Magsaysay did not consult with other specialists upon the transfer of plaintiff to intensive care.

On December 24, plaintiff reported no chest pains. Her thighs continued to be swollen, and blood transfusions were continued. Plaintiff was transferred to St. James Hospital on December 25, 1973. She was discharged on January 4, 1974. This action was filed on December 16, 1975.

At trial, the vice-president of the Hospital's nursing department testified as to the manner in which nurses make records in a patient's chart. Five nurses who had been involved in the postoperative care of plaintiff testified as to the procedures by which nurses monitor the patient and make notations in the medical chart.

Nurse Esperanza Buscaino testified as to the entry she made on December 17, 1973, indicating plaintiff's legs were wrapped in Ace bandages when plaintiff was brought into the nursing unit. Nurse Buscaino also indicated in plaintiff's chart on December 20 that plaintiff was crying and complaining of numbness in her left leg. She had noted that plaintiff was ambulated to the washroom with assistance on that day. Nurse Buscaino also stated the chart first revealed signs of bleeding on

December 23. She could not recall if she ever removed the bandages on plaintiff's legs to examine them, but stated that nurses would normally check for bleeding and circulation problems as part of their general care.

Nurse Margaret Jagielski testified patients being treated with heparin are monitored for signs of bleeding. During her care of plaintiff she observed no signs of bleeding. Nurse Phyllis Harnish could not recall if plaintiff had bandages on her legs. She also stated a patient being treated with heparin would be monitored for signs of bleeding. No such signs appeared on plaintiff's chart through December 22, when Nurse Harnish made her last entry. Nurse Virginia Agcayab stated the chart revealed plaintiff was "ambulatory" on December 22. This meant plaintiff had been able to sit up and stand. Nurse Jan Joswiak, who cared for plaintiff during her treatment in the Hospital's intensive care unit, testified plaintiff's condition improved in the intensive care unit.

Dr. Magsaysay testified under section 60 (Ill. Rev. Stat. 1979, ch. 110, par. 60). He is a specialist in vascular surgery and has authored part of a text on that subject. He knew plaintiff when she worked at the Hospital. She had asked him if he could perform surgery on her varicose veins. He agreed to perform the surgery before having physically examined plaintiff, but ordered her to undergo preoperative testing at the Hospital. The decision to proceed with the surgery was, in his opinion, mutual.

Dr. Magsaysay testified he and an intern performed a physical examination on plaintiff on the morning of December 17 just prior to surgery. He stated that contrary to his previous deposition testimony, this examination did not take place on December 16, indicating a wrong date on the examination report. Plaintiff informed Dr. Magsaysay she had been previously hospitalized for a leg condition called thrombophlebitis. (An inflammation of the vein which precedes the formation of a thrombus or clot within the vein.) An examination of her legs revealed painful swelling of both knees, but plaintiff did not complain of other leg pains. He noted her previous history of excessive bleeding following surgery.

Dr. Magsaysay testified patients must be examined directly prior to this type of surgery to be sure there were no acute problems which could rule out surgery. There were no indications of any such problems in this case, and no factors which would contraindicate the surgery. The results of the Partial Thromboplastin Time Test (PTT, a measurement of clotting time), although above normal, ruled out a potential complication of excessive bleeding as the abnormality was "not significant." The doctor did not perform a preoperative venogram (vein test) on plaintiff. There were inherent risks involved in such a test. Also, the three clinical signs which would indicate the need for a venogram were not present.

Dr. Magsaysay stated plaintiff had no abnormal complaints on the first day after surgery. On December 19, however, she complained of

chest and left calf pain. He personally examined her and removed her bandages to inspect the legs. Her condition was indicative to him of a possible pulmonary embolism, which could prove fatal. He ordered a lung scan and heparin therapy. Dr. Magsaysay did not perform additional PTT or Lee White blood clotting tests as it is rare to have complications of bleeding with the use of heparin. In his opinion, those tests would not have been useful in treating a patient for a pulmonary embolism with heparin. He admitted bleeding was a possible side effect of heparin treatment, but noted that bleeding is not usually fatal, while a pulmonary embolism may be fatal. Dr. Magsaysay did not perform a blood gas study as its results would not necessarily be consistent with the diagnosis. Similarly, the fact that the pulmonary scan taken on December 20 was normal did not rule out the diagnosis of a pulmonary embolism whereas the EKG examination was supportive of this diagnosis. In Dr. Magsaysay's opinion it was necessary to treat plaintiff for a potential pulmonary embolism until it had been ruled out.

Dr. Magsaysay testified plaintiff was continually monitored for postoperative bleeding by observation of her vital signs and blood pressure in addition to regular inspections of her operative sites. He stated that the notes concerning his examination of plaintiff on December 20 could not have been made without having first removed her bandages. The pain and pallor plaintiff experienced prior to December 22 did not necessarily indicate a loss of blood.

In Dr. Magsaysay's opinion, plaintiff was very ill when transferred to the intensive care unit on December 23. Although a Hospital bylaw stated that a treating physician should consult with a specialist when a patient is transferred to the intensive care unit, Dr. Magsaysay did not do so in this case. He believed that because plaintiff's complication arose within the area of his own specialty, vascular surgery, it was unnecessary to consult with another specialist in this field. Dr. Magsaysay noted plaintiff improved while in the intensive care unit.

Dr. Husang Javid, a specialist in cardiovascular surgery, testified for plaintiff. Many of his opinions were expressed in response to a lengthy hypothetical question. He stated that before a vein stripping, a physician would require the patient's medical history of previous leg problems. A physical examination is also important to determine the tendency for bleeding. A venogram would be helpful to determine the presence of vein problems, but was not a routine procedure before a vein stripping operation due to its own possible complications.

Dr. Javid stated the diagnosis of a pulmonary embolism is the same whether a patient has been operated upon or not. If a physician detects physical signs of such a condition, a lung scan should be performed. If, however, the results were negative, a blood gas study and venogram

should be performed before heparin is administered. A failure to perform such tests would be outside the standard of care as it existed in the community in 1973. Similarly, a failure to perform Lee White tests before and during heparin treatment would also be outside the standard of care. The administration of percodan to a patient being treated with heparin without having performed the Lee White test would also be outside the standard of care. Dr. Javid also believed the detection of plaintiff's bleeding was not "prompt" and that it was outside of the standard of care not to have conducted blood counts while treating a patient with an anticoagulant. Dr. Javid also believed a patient undergoing heparin treatment for a pulmonary embolism should get as complete bed rest as possible. In his opinion, it would not be "good" if such a patient were to be "ambulated about the hospital."

On cross-examination, Dr. Javid stated it would not be proper for a vein stripping to be performed without the surgeon having first examined the patient's legs. He noted the medical records indicated an examination was performed, but the chart did not give complete details. Dr. Javid believed vein stripping is a common procedure. It was not routine to conduct a venogram prior to surgery because of its risks. Dr. Javid also noted there were error factors involved in the lung scan and blood gas tests in determining the presence of a pulmonary embolism. He agreed a pulmonary embolism can be fatal whereas bleeding can be treated. Heparin was the proper treatment for a pulmonary embolism, and transfusions were the proper treatment for bleeding. Dr. Javid believed bleeding could have been possible even if all of the above-detailed tests had been performed. In his opinion, the treating physician would have been in the best position to determine the proper course of treatment.

Dr. Theodore Schafer is a general practitioner and was a former treating physician of plaintiff. He testified he was not an expert in vascular surgery, and could not offer an "expert" opinion on the subject. Any criticism of Dr. Magsaysay and his treatment of plaintiff should, in his opinion, be left for the "experts." Dr. Schafer did state he generally advises women to postpone having varicose vein surgery until after having children.

Dr. Dinesh Desai is a specialist in internal medicine practicing at St. James Hospital. He treated plaintiff when she was transferred to St. James Hospital in December 1973 and when she was subsequently hospitalized for thrombophlebitis in September 1974. It was his opinion that the drug percodan should not be given to a patient being treated with heparin because it could enhance the anticoagulant effect of heparin. When asked if a postphlebitic syndrome could occur from a vein stripping performed on a patient with a past history of thrombophlebitis, Dr. Desai stated such a result "may or may not be a speculation."

Dr. Desai stated plaintiff's condition had been improving prior to her admission to St. James Hospital. He concurred with the other physicians that a pulmonary embolism can be life threatening and is properly treated with heparin. Dr. Desai did not believe it necessary to perform a venogram on plaintiff on either occasion he treated her because of the hazards involved in such a procedure. Dr. Desai would not venture an opinion as to whether a subsequent flareup of thrombophlebitis after surgery would indicate something had been improperly done. He stated he was not an expert in that field.

Plaintiff's mother, Mrs. Horan, testified she noted plaintiff's legs were swollen and discolored when visiting her daughter on December 18. This swelling and discoloration had increased when she saw plaintiff on December 19 and 20. On December 21, Mrs. Horan noted plaintiff's legs to be "grossly swollen" and heavily discolored. By December 22, plaintiff was "stuporous," and by December 23 plaintiff was unable to talk or sit up.

Mrs. Horan testified she never observed any bandages wrapped around plaintiff's legs. She did not recall seeing either Dr. Magsaysay or any of the nurses examine plaintiff. She did not mention the condition of her daughter's legs to any of the nurses. Mrs. Horan believed it would be incorrect to state that plaintiff's legs had been bandaged or that plaintiff had been able to complain between December 21 and December 25. She did not believe it was necessary to speak to the hospital staff concerning her daughter's condition until she had decided to transfer plaintiff to St. James Hospital.

Plaintiff testified she had been employed at the Hospital in the X-ray department for over a year prior to December 1973. At that time she was in her first semester of nursing school. She had varicose veins since 1965. Plaintiff testified she had three conversations with Dr. Magsaysay. He told her surgery could correct her difficulty with a minimum of problems. She stated she did not ask him for the operation nor did she even initiate the discussion of surgery. One week prior to surgery, Dr. Magsaysay asked her some general questions, but did not inform her of the risks of the operation.

When plaintiff checked into the Hospital for her operation, she was given a computerized history form to complete. A physician or intern, whom she did not know, went over it with her. She could not recall any physical examination on the morning before surgery by any physician, and Dr. Magsaysay did not see her. She had no recollection of the days following surgery except that her legs were swollen and she remembered experiencing pain and discomfort. However, in her deposition she stated she made complaints of chest and leg pains on those days. Also, in her deposition she recalled receiving drug treatments during those days. After

her operation, the pain and discomfort were worse than before. She eventually recovered and completed her nurse's training. Plaintiff was subsequently hospitalized for her leg condition and detailed the costs incurred.

On cross-examination, plaintiff admitted she had read the surgery consent form before signing it. She had been aware it was important to give an accurate medical history when she had filled out the computerized form. She admitted she had not told the intern her knees were swollen when her history was reviewed. Plaintiff could not recall if her legs had been bandaged after the operation.

Plaintiff stated she did discuss the advisability of surgery with Dr. Magsaysay during their second conversation prior to surgery. She was aware the consent form she signed stated she had full knowledge of the operation. Dr. Magsaysay answered all questions concerning the operation. Plaintiff had consulted her textbooks about vein stripping and was aware that complications could result. Plaintiff also admitted the greater part of the swelling and discoloration of her legs eventually disappeared. She has since been able to return to work.

Dr. Stanton Polin, a certified specialist in vascular surgery, testified for defendants. In response to a hypothetical question, Dr. Polin stated he believed the attending physician practiced within the usual standard of care. Dr. Polin believed a condition of preoperative knee swelling and leg cramping, as well as previous thrombophlebitis, would not necessarily contradict a vein stripping. In his opinion, the record did not indicate a necessity for a preoperative venogram, partially due to the inherent risks in such a procedure.

Dr. Polin testified the record indicated a strong suspicion that plaintiff had developed a possibly life-threatening pulmonary embolism after the operation. He had no criticism of the treatment administered. Failure to treat the patient in this manner would, in his opinion, be subject to criticism. He believed heparin to be the most commonly used therapy for a pulmonary embolism. Dr. Polin stated it was within the standard of care to treat a patient with heparin without performing PTT and Lee White tests due to the inaccuracies of such tests. Such inaccuracies, Dr. Polin stated, could mislead a treating physician. Dr. Polin also noted that while bleeding can be controlled, a pulmonary embolism could be fatal. He also believed that a physician who transfers a patient to the intensive care unit need not consult with another specialist if the patient's problem lies within the expertise of the transferring physician.

On cross-examination, Dr. Polin stated a venogram could prove helpful, as it would indicate a patient's active phlebitis prior to surgery. Signs of such a condition would be edema, calf tenderness, and a positive

Homan's sign. Dr. Polin believed that while there was a possibility of bleeding during heparin administration to a recently operated patient, bleeding would be evidenced by physical signs of which there were no indications on plaintiff's chart. Postoperative pain could be a sign of bleeding, but was more likely indicative of something else. The worsening of a patient's pain would tend, however, to indicate bleeding.

On recross, Dr. Polin noted that because leg pains could indicate bleeding, it would be important for the medical personnel to check the patient's legs. He stated that plaintiff's hospital charts indicated the doctors and nurses did examine her legs. In his opinion, plaintiff's charts indicated no evidence of postoperative bleeding until December 23, 1973. Dr. Polin found no improper treatment by the Hospital staff. He also noted it was common for physicians to disagree.

In this court, plaintiff argues that the trial court erred in denying her motions for directed verdicts against both defendants and in refusing to enter a judgment in favor of plaintiffs notwithstanding the verdict. Plaintiff also contends the jury verdict was against the manifest weight of the evidence. Finally, plaintiff argues a new trial is warranted due to trial errors and prejudicial comments by counsel.

This court recently restated the standard for directed verdicts and judgments notwithstanding the verdict (*Hirn v. Edgewater Hospital* (1980), 86 Ill. App. 3d 939, 946, 408 N.E.2d 970):

> "Under the *Pedrick* rule (*Pedrick v. Peoria & Eastern R. R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504), a directed verdict or a judgment notwithstanding the verdict should only be entered when the evidence, viewed in a light most favorable to the opponent, 'so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' (37 Ill. 2d 494, 510.)"

Furthermore, where controverted issues of fact are presented for the jury to decide, motions for directed verdict or judgment notwithstanding the verdict must be denied. 86 Ill. App. 3d 939, 947.

In *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279, the court held:

> "As this court recognized in *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, the appellate decisions in this State have held that the plaintiff in a medical malpractice action generally must establish the standard of care through expert testimony. The plaintiff must then prove that, judged in the light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff. [Citations.]"

# I
## Informed Consent

The standard of proof with regard to informed consent was clearly set forth in *Green v. Hussey* (1970), 127 Ill. App. 2d 174, 184-85, 262 N.E.2d 156, as follows:

"We conclude that to establish liability for defendants' failure to inform plaintiff of the foreseeable risks or results involved in [the treatment] and available alternatives, if any, plaintiff had the burden of proving by expert medical evidence that the reasonable medical practitioner of the same school, in the same or similar circumstances, would have told the patient of such risks, or that the disclosures as made by the defendants did not meet the standard of what a reasonable medical practitioner would have disclosed under the same or similar circumstances. [Citation.] Also, plaintiff had the burden of proving by expert medical testimony that such failure was the proximate cause of her damage."

*Green* has been correctly described as "the leading case in Illinois dealing with informed consent." *Casey v. Penn* (1977), 45 Ill. App. 3d 573, 584, 360 N.E.2d 93, *appeal denied* (1977), 66 Ill. 2d 629; see also *Miceikis v. Field* (1976), 37 Ill. App. 3d 763, 767, 347 N.E.2d 320, *appeal denied* (1976), 63 Ill. 2d 557.

We find these requirements were not met in the instant case. Although plaintiff asserts that "expert testimony established a woman of childbearing age should not have this surgery," our review of the record discloses no such expert testimony. The only medical testimony on this subject was by Dr. Schafer, a general practitioner. He testified he advises women to avoid this surgery until after having all the children they wish to have as further problems could be caused by a pregnancy.

■■ This testimony fails to establish a prima facie case under the above-quoted *Green* standard. First, Dr. Schafer was a general practitioner and not, by his own testimony, an expert medical witness. Dr. Schafer continually refused to answer questions, preferring to leave such opinions "to the experts." Second, there is no evidence that plaintiff's difficulties were in any way related to a future pregnancy. Thus, the above requirements have not been met. See *Green*, 127 Ill. App. 2d 174, 184-85.

Plaintiff's assertion that Dr. Magsaysay failed to inform plaintiff of a possible pulmonary embolism following surgery or of possible alternatives to surgery must also be rejected on these grounds. The record contains no expert testimony that a failure to warn plaintiff of a possible pulmonary embolism was a violation of the proper standard of care. Dr. Magsaysay was the only medical witness asked whether a pulmonary embolism is an expected risk of surgery. He stated it was not. The lack of expert

testimony in support of plaintiff's contention causes us to reject it under *Green*.

This is also true of plaintiff's assertion that Dr. Magsaysay failed to inform her of possible alternatives to surgery. Again, the only medical witness to testify as to alternative treatments was Dr. Magsaysay. In his opinion, the severity of plaintiff's varicose veins obviated any possible alternative treatment. No other medical expert contradicted this testimony. Thus, plaintiff did not establish a lack of informed consent under the *Green* standard. 127 Ill. App. 2d 174, 184-85.

Plaintiff argues Dr. Magsaysay should have been charged with an affirmative duty to warn plaintiff of the dangers involved in the surgical procedure. However, the authority cited in support of this argument (*Pitler v. Michael Reese Hospital* (1980), 92 Ill. App. 3d 739, 745, 415 N.E.2d 1255) concerns the alleged failure to investigate or warn of the hazards of a "dangerous condition" (radiation therapy) and is not applicable to the doctrine of informed consent.

In addition, this court has held that the duty to inform is linked to and limited by the duty of "discretion in prudently disclosing information" in accordance with the welfare and best interests of the patient. See *Miceikis*, 37 Ill. App. 3d 763, 768, and cases and commentaries there cited.

## II
### Preoperative Care

It is not controverted that approximately one week prior to surgery, Dr. Magsaysay personally took plaintiff's medical history and told her to undergo preoperative laboratory testing at the Hospital. It is also uncontradicted that plaintiff completed a detailed medical history form which was analyzed by computer and reviewed with plaintiff by a Hospital resident or intern. The evidentiary conflict at trial was whether plaintiff was examined by Dr. Magsaysay prior to surgery. Plaintiff's expert witness, Dr. Javid, testified the failure to conduct a proper preoperative examination would be outside the standard of care.

Dr. Magsaysay testified he and an intern examined plaintiff in her room approximately one hour before surgery and found no reason which would contraindicate surgery. He admitted having previously stated in a deposition that he had examined plaintiff only on the evening prior to surgery which was December 16. He also stated that the December 16 date on the examination report was a mistake.

Plaintiff, on the other hand, testified she recalled Dr. Magsaysay did not see her on the morning of December 17. It was also noted that in a previous deposition, plaintiff had stated she did not remember if Dr. Magsaysay saw her on that morning prior to surgery.

■■ This contradictory testimony presents a question of fact for the jury to decide. The jury was not required to accept plaintiff's testimony, but was required to weigh her credibility in light of the entire surrounding circumstances. (See *Northern Trust Co. v. Skokie Valley Community Hospital* (1980), 81 Ill. App. 3d 1110, 1116, 401 N.E.2d 1246.) It is manifest that "the jury, as trier of fact, is the sole judge of the credibility of the witnesses and as such its verdict will not be overturned by a court of review unless it is clearly contrary to the manifest weight of the evidence." (*Joynt v. Barnes* (1979), 71 Ill. App. 3d 187, 197, 388 N.E.2d 1298, *appeal denied* (1979), 79 Ill. 2d 611.) We cannot say the verdict is against the manifest weight of the evidence. Therefore we may not disturb it.

Plaintiff bases a contention regarding the failure of Dr. Magsaysay to perform a preoperative venogram on the testimony of Dr. Javid. He testified a venogram would help to determine accurately the presence of vein problems which might have contraindicated the surgery or suggested a potential bleeding problem. However, Dr. Javid himself testified that such a procedure was "not routine" and that a physical examination and history can usually tell a physician of the likelihood of potential problems. Both Dr. Polin and Dr. Magsaysay also testified venograms were not routine due to the inherent complications of the procedure itself. Dr. Polin specifically stated that in his opinion, plaintiff's record contained no evidence to indicate the need for a venogram.

■■ As above pointed out, we are obliged to accept the verdict of the jury rendered upon conflicting testimony.

## III
### Postoperative Treatment

Plaintiff first contends Dr. Magsaysay improperly diagnosed her condition as a pulmonary embolism and failed to support his diagnosis with the proper diagnostic tests. Plaintiff's witness, Dr. Javid, testified he did not believe the record supported Dr. Magsaysay's diagnosis of a pulmonary embolism. Dr. Javid agreed Dr. Magsaysay properly obtained a lung-scan test to confirm the diagnosis. However, because the lung scan result was "negative," Dr. Javid believed it was outside the standard of care to administer the anticoagulant heparin without first performing blood gas studies and a venogram. Furthermore, Dr. Javid believed it was a deviation from the standard of care to administer heparin and percodan, both anticoagulants, without performing blood tests to monitor the possibility of bleeding.

This evidence was contradicted by the testimony of both Dr. Magsaysay and Dr. Polin. Both agreed the postoperative pain and calf weakness experienced by plaintiff were indicative of a pulmonary embolism when considered in combination with her previous medical

history. Dr. Magsaysay also noted that although the lung scan results were negative, there was an error factor between 15 and 25 percent. Dr. Magsaysay further noted the EKG test results were supportive of his diagnosis. Dr. Magsaysay specifically testified he did not perform a postoperative venogram because it would not have helped to determine the existence of a pulmonary embolism and because of its inherent risks.

All physicians agreed heparin is proper in treating a pulmonary embolism. In the opinion of Dr. Polin, it was within the standard of care to administer heparin without performing the blood tests suggested by Dr. Javid. Dr. Polin believed such tests could give inaccurate results which could be misleading in treating a pulmonary embolism. Furthermore, Dr. Polin stated clinical observation is an acceptable method of monitoring a patient being treated with anticoagulants.

Here again, this court is obliged to accept the verdict reached after consideration of contradictory evidence.

Plaintiff also contends Dr. Magsaysay deviated from the standard of care in prescribing tetracycline for plaintiff on December 17 without having first ordered a blood culture and urinalysis and for failing to order the drug protamine on December 23 to counter the effects of heparin. We do not find, however, sufficient medical evidence of record to "establish the standards of care to which the doctor is to be held * * *" (*Joynt*, 71 Ill. App. 3d 187, 196). Dr. Javid testified the failure to order blood cultures and a urinalysis to rule out the possibility of infection would be a deviation from the standard of care if the suspected infection was in the lungs or blood. However, he stated if the suspected infection was in the calf area, as in the instant case, it would be impossible to obtain an infection study. Thus, the standard of care was not properly established.

Similarly, no medical witness testified that the failure to administer protamine to counter the effects of heparin was outside the standard of care. This failure to establish the prevailing standard of care requires us to reject this argument.

IV
### Postoperative Heparin Treatment

Plaintiff next contends defendants were negligent in monitoring plaintiff while she was being treated with heparin. Plaintiff urges clinical signs of bleeding evidenced by gross swelling and discoloration of her legs should have been noted prior to December 23.

Plaintiff does not rely on her own recollections in this regard. She testified she could not recall the days subsequent to surgery. She relies on the testimony of her mother, Mrs. Horan, who testified she could see plaintiff's legs becoming increasingly discolored and swollen each day following surgery. Mrs. Horan could not recall seeing Dr. Magsaysay or

any of the treating nurses enter the room and examine plaintiff prior to December 23. She could see no "visible" bandages wrapped around plaintiff's legs and it was possible to see the discoloration of plaintiff's legs merely by lifting up the hospital gown. Plaintiff also relies on the testimony of Dr. Javid, who stated it would be difficult to explain the low blood count of plaintiff when she was admitted to the intensive care unit had she not been bleeding undetected.

In contrast to this testimony, defendants noted the medical records stated plaintiff's legs were wrapped in Ace bandages when she was removed from the recovery room. Both Nurse Buscaino, who made that notation, and Nurse Harnish stated any bleeding and swelling would have been detected, as examinations of plaintiff's legs were part of their general care. Dr. Magsaysay testified plaintiff's legs were continually examined by him personally and monitored for signs of bleeding. Dr. Magsaysay also stated that since the chart indicated he did examine her legs he must have removed the bandages in order to have done so. Furthermore, Dr. Polin stated there would have been signs if plaintiff's legs had been bleeding. He stated plaintiff's chart did not reveal any of those signs.

Here again, this court is obliged to accept the verdict reached after consideration of contradictory testimony.

## V
### Reinstitution of Heparin Treatment

Plaintiff next urges the evidence established a breach of the standard of care by both defendants in the reinstitution of heparin on December 22 without first having taken a Lee White test.

Dr. Javid testified such conduct would be a breach of the standard of care by the attending physician. In contrast, Dr. Polin stated the reinstitution of heparin was well within the standard of care. He believed the record established a recurrence of the symptoms of a possible pulmonary embolism.

Here again, this court is obliged to accept the verdict reached after consideration of contradictory testimony.

With respect to the defendant Hospital, we find the evidence fails to establish a standard of care from which there was any deviation in this instance. (See *Joynt*, 71 Ill. App. 3d 187, 196.) The record established that when plaintiff began to complain of chest pain on December 22, a nurse contacted the house physician. He in turn contacted Dr. Magsaysay. Heparin was reinstituted on Dr. Magsaysay's orders. This was noted in plaintiff's chart as "orders received." There is no evidence such procedure was a deviation from the standard of care. Dr. Javid testified the procedure by which a nurse called the house physician to examine

plaintiff was within the standard of care for a nurse. According to Dr. Javid, it would be a standard procedure for a nurse to note "orders received" on a patient's chart after receiving verbal or telephone orders from a physician. Dr. Polin concurred that such procedure was within the standard of care for a hospital. Therefore, we cannot say plaintiff demonstrated any negligence on the part of the Hospital on this point.

## VI
### Ambulation of Plaintiff

Plaintiff further contends both defendants were negligent in allowing plaintiff to ambulate. Plaintiff relies on the testimony of Dr. Javid, who said it was "not good" for a patient being treated with heparin to be "ambulated about the hospital" and on the undisputed testimony that such a patient should have "complete bedrest."

We find there is no evidence plaintiff was ever "ambulated about the hospital." Rather, plaintiff was permitted bathroom privileges on several occasions. More importantly, plaintiff did not establish in any manner that her ambulation to this limited extent was in any way a cause of illness or injury to plaintiff. This argument must therefore be rejected. See *Wise v. St. Mary's Hospital* (1978), 64 Ill. App. 3d 587, 589, 381 N.E.2d 809.

## VII
### Transfer of Plaintiff To
### Intensive Care Without Consultation

Plaintiff contends both defendants were guilty of negligence because plaintiff was transferred to the intensive care unit of the Hospital without a consultation from another qualified physician contrary to the bylaws of the Hospital. Plaintiff contends this violation establishes negligence of Dr. Magsaysay while the failure of the Hospital to have required such a consultation established its own negligent conduct.

■■■ We cannot agree the failure to follow Hospital bylaws establishes negligence by the defendants. While hospital bylaws and regulations are admissible as evidence of negligence, they do not "conclusively determine the standard of care * * *." (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 332, 211 N.E.2d 253, *cert. denied* (1966), 383 U.S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204.) Rather, such regulations are only part of the evidence to be considered by the jury. A plaintiff must prove not only the violation of the bylaws, but that such violation proximately caused the injury to the plaintiff. *Eckley v. St. Therese Hospital* (1978), 62 Ill. App. 3d 299, 305-06, 379 N.E.2d 306, *appeal denied* (1978), 71 Ill. 2d 617, citing *Ybarra v. Cross* (1974), 22 Ill. App. 3d 638, 644-45, 317 N.E.2d 621.

At trial, both Dr. Magsaysay and Dr. Polin testified they believed the

regulation required a consultation only if the patient had developed a complication outside the area of the expertise of the treating physician. Dr. Magsaysay specifically stated he did not seek a consultation because plaintiff's complication was within the area of his own specialty. Thus, this matter also became an issue for the jury to determine. As above shown, this court will not disturb the verdict.

Plaintiff failed to establish that the failure to obtain a consultation was the proximate cause of any injury to the plaintiff. Rather, the evidence suggests strongly her condition improved while in the intensive care unit of the Hospital.

## VIII
### Contributory Negligence

■■ Plaintiff argues the major error at trial was the introduction of contributory negligence as an issue and submission of this issue to the jury without expert testimony and proper instructions. Plaintiff also contends error because contributory negligence was confused at trial with the doctrine of assumption of the risk.

We cannot agree the introduction of the issue of contributory negligence at trial was error. In *Carman v. Dippold* (1978), 63 Ill. App. 3d 419, 429, 379 N.E.2d 1365, *appeal denied* (1978), 71 Ill. 2d 617, this court stated:

> "[S]ince a plaintiff in Illinois has the burden to prove himself free from contributory negligence, unless the court directs in plaintiff's favor on that issue [citations], contributory negligence remains a jury question [citation], that warrants an instruction."

Plaintiff's complaint alleged she was at all times in exercise of ordinary care. The issues instruction submitted to the jury also asserts plaintiff was injured "while exercising ordinary care." Plaintiff did not request a directed verdict on the issue of her freedom from contributory negligence. Therefore, we find no error in allowing this issue to go to the jury.

Plaintiff argues the trial court erred in allowing this issue to go to the jury without expert testimony as regards failure of plaintiff to give a full and complete medical history prior to surgery. However, we do not find it necessary to consider this issue. If the jury believed plaintiff failed to exercise ordinary care, a verdict in favor of defendants was required without the need to consider the remaining factual issues. If, however, the jury found plaintiff did exercise ordinary care, it would then be required to consider the factual issues concerning the case against the defendants. Only a general verdict was returned in favor of defendants. No special interrogatories were submitted to the jury nor did plaintiff seek a directed verdict on the contributory negligence question. Thus, we do not know

how the jury determined this issue. Plaintiff's assertion that there was an "implicit" ruling on this issue is pure speculation. Therefore, the argument that the lack of expert testimony on this issue was prejudicial must also be rejected as speculative.

We also find no vagueness in the jury instruction submitted on this issue by defendants. The contributory negligence instruction was identical to that found in the Illinois Pattern Jury Instructions (Illinois Pattern Jury Instructions, Civil, No. 10.03 (2d ed. 1971) (hereinafter cited as IPI Civil)). It was totally proper for the facts at issue.

Finally, our review of the record has failed to uncover any introduction of the defense of assumption of the risk at trial nor was such a defense utilized in the cases cited by plaintiff (*Miceikis*, 37 Ill. App. 3d 763, *Green*, 127 Ill. App. 2d 174). Generally speaking, the defense of assumption of risk is confined to cases where the parties have a contractual or employment relationship. *Provence v. Doolin* (1980), 91 Ill. App. 3d 271, 280, 414 N.E.2d 786.

## IX
### Instruction On Hospital Bylaws

Plaintiff submits the trial court erred in refusing to tender to the jury her instruction No. 14 on the issue of the Hospital's failure to follow its own bylaws. This instruction directed the jury that the failure of a hospital to follow its own bylaws "is a form of negligence that is called malpractice."

We believe the trial court properly refused this instruction. As noted above, it has been held that while hospital bylaws are to be considered as evidence, they do not conclusively determine the standard of care (*Darling*, 33 Ill. 2d 326, 332), and a plaintiff must prove the violation of a bylaw was the proximate cause of the injury (*Eckley*, 62 Ill. App. 3d 299, 305-06). Therefore, the trial court properly refused a jury instruction which would have established the violation of a hospital bylaw as per se negligence.

## X
### Instruction On Failure
### To Produce Witnesses

Plaintiff also argues the trial court improperly denied her request to submit to the jury IPI Civil No. 5.01. Plaintiff contends the jury should have been permitted to consider the Hospital's alleged failure to produce witnesses to interpret its bylaws. Plaintiff also contends the instruction was appropriate because the Hospital did not produce enough of its staff or "explain the whereabouts of missing employees."

We find no error in the refusal to give this instruction. Both Dr.

Magsaysay and Dr. Polin testified as to the operation of the bylaw in question. Any further testimony on this point would have been cumulative. (See *Pope v. St. John's Hospital* (1970), 128 Ill. App. 2d 325, 329, 262 N.E.2d 369, *appeal denied* (1971), 45 Ill. 2d 590.) Furthermore, counsel for plaintiff entered into a stipulation at trial which obviated the need for testimony by a Hospital administrator concerning the bylaws.

We also find no merit in the allegation that the Hospital failed to produce certain employees or explain their absence. It should be noted the Hospital provided as witnesses for plaintiff under section 60 (Ill. Rev. Stat. 1979, ch. 110, par. 60), its vice-president for nursing service and five nurses who took part in plaintiff's treatment. Plaintiff has failed to specify why additional testimony by Hospital employees would have been anything but cumulative. (See *Pope*, 128 Ill. App. 2d 325, 329.) This argument is rejected.

## XI
### *Misconduct of Defendants' Counsel*

Plaintiff finally contends she was prejudiced at trial by frequent misconduct by both defense counsel during opening and closing arguments and during the cross-examination of plaintiff and her mother. Plaintiff contends these misstatements permitted argument of false issues to the jury.

■■ First, we note plaintiff failed to make any objections during the testimony of Mrs. Horan. Any possible errors were therefore waived. (See *People v. King* (1977), 66 Ill. 2d 551, 559, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273.) Plaintiff made a total of seven objections during the cross-examination and recross-examination of plaintiff. Of these, five were sustained, thus curing any possible prejudice resulting therefrom. (See *People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200.) The remaining two objections dealt with a question previously asked and answered and previous testimony plaintiff argued was nonimpeaching. We see no resultant prejudice in this regard. The issues before this court were not in any way involved.

With respect to the alleged misstatements and false issues argued to the jury by defense counsel, we note the majority of the statements objected to by plaintiff dealt with the credibility of plaintiff and her mother and the issues of informed consent and contributory negligence. As stated above, contributory negligence and informed consent were important factual issues involved in this case, and were therefore properly argued to the jury. With respect to the overall tenor of the argument to the jury by defense counsel, this court has stated (*Saputo v. Fatla* (1975), 25 Ill. App. 3d 775, 788, 324 N.E.2d 34, *appeal denied* (1975), 58 Ill. 2d 599):

"In arguing a case to the jury, counsel is allowed broad latitude

in drawing reasonable inferences and conclusion from the evidence [citation], and may further comment, within reasonable limits, on those who give evidence. The scope of permissible argument is within the sound discretion of the trial court."

"[E]very reasonable presumption must be indulged that the court has performed its duty and properly exercised the discretion vested in it." (*Hirn*, 86 Ill. App. 3d 939, 953.) As the majority of comments objected to by plaintiff were either reasonable inferences drawn from the evidence or directed at the credibility of the witnesses, we find no abuse of discretion by the trial court. On the contrary, we find this lengthy trial was remarkably free from error largely because of the fair and able manner in which the trial judge exercised his authority.

For these reasons, the judgment appealed from is affirmed.

Judgment affirmed.

CAMPBELL, P. J., and McGLOON, J., concur.