**Sue PARDY, Guardian of the Estate of James R. Pardy, Plaintiff-Appellant,**

v.

**The UNITED STATES of America, Defendant-Appellee.**

No. 84–2954.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1985.

Decided Feb. 14, 1986.

Gary E. Peel, Edwardsville, Ill., for plaintiff-appellant.

Robert L. Simpkins, Frederick J. Hess, U.S. Attys., East. St. Louis, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, BAUER, Circuit Judge, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

On November 2, 1978, Mr. James Pardy visited the Scott Air Force Base (SAFB) Primary Care Clinic after having felt poorly for a week to ten days. He was suffering from a cough and fever and he suspected the flu. Tests were performed. Mr. Pardy was given erythromycin and decongestants and released. He was asked to return the following day. On the next day, November 3, Mr. Pardy returned feeling worse, experiencing an aching groin, high fever, nausea and a headache. Dr. William R. Kelso III discovered Mr. Pardy had experienced burning during urination and had a high white blood cell count. Pyelonephritis, or a kidney infection, was now suspected. An I.V.P., an intravenous urogram, was ordered for Mr. Pardy. This test involves injecting an iodine contrast medium or dye into a vein in order to highlight internal organs for X-ray. After a subsequent physical examination of Mr. Pardy, Dr. Kelso also discovered an enlarged, tender prostrate and penile discharge. This indicated prostatitus rather than kidney infection. The medical signals had now become mixed.

Dr. Kelso waited until the next day to do anything. On November 4, Mr. Pardy's condition had drastically improved. Dr. Kelso discussed with his supervisor whether the I.V.P. was still desirable. If Mr. Pardy suffered from prostatitus, the I.V.P. was not necessary. However, several of Mr. Pardy's symptoms, such as the high white blood cell count and his history of a urinary tract infection, indicated there may be more than prostatitus involved. An obstruction or lesion in the urinary tract was a possibility. Indeed, such a condition could also cause the prostrate to become enlarged, as was the case with Mr. Pardy. These concerns led the doctors to conclude an I.V.P. was still the desirable route to take.

Mild reactions affect approximately 15% of patients who are administered an I.V.P. (sweating, nausea, vomiting and hives). However, there is also a remote risk of a severe reaction to an I.V.P. One in 14,000 patients suffers from a severe reaction (severe drop in blood pressure or cardiopulmonary collapse). One in 40,000 patients dies due to an I.V.P. Based on these odds and on his experience, Dr. Kelso believed an informed consent was unnecessary before an I.V.P. was performed. While he did tell Mr. Pardy why the I.V.P. should be administered, how it was administered, and a few

---

* The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

of the mild side effects from the test, no written or informed consent was ever secured from Mr. Pardy or his wife.

On November 6, the I.V.P. was administered to Mr. Pardy. Dr. Daley, a radiologist, injected Mr. Pardy with the appropriate dye (called Conray 60). Prior to injection Dr. Daley asked Mr. Pardy if he ever had an I.V.P. or was allergic to any drugs. Mr. Pardy answered no. Dr. Daley also did not obtain an informed or written consent from Mr. Pardy because in his opinion standard medical practice did not require it. Indeed, Dr. Daley believed informing patients of the remote possibility of a severe reaction to the I.V.P. would increase patient anxiety which in turn would increase the chance of a severe reaction. A severe reaction could become self-inducing.

Shortly after the injection Mr. Pardy became nauseous and began to vomit. When the vomiting subsided, Dr. Daley proceeded to the X-ray room to take X-rays. Shortly thereafter, Mr. Pardy curled up on the table. When attended to he became combative. He was unable to breathe. Mr. Pardy began to have seizures, the first time a patient of Dr. Daley's had had such a severe reaction after the performance of approximately 600 I.V.P. tests. Dr. Daley summoned the appropriate emergency hospital personnel. In sum it took approximately seven minutes before Mr. Pardy was able to breathe regularly again. Unfortunately, however, by this time Mr. Pardy had suffered brain damage due to an inadequate supply of oxygen.

Plaintiff Sue Pardy, guardian of the estate of James Pardy, subsequently filed this lawsuit in the United States District Court for the Southern District of Illinois. The suit arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* A bench trial was held on July 24–26, 1984 and Chief Judge James Foreman entered judgment in favor of the defendant, the United States. Our review for appellate purposes centers on the issue of whether the failure of SAFB hospital physicians to obtain an informed consent from Mr. Pardy before performing the I.V.P. fell below the acceptable standard of medical care, constituting medical malpractice/negligence. There is also a second issue as to whether the failure to obtain an informed consent proximately caused Mr. Pardy's injuries. A third issue plaintiff raises is whether the district court erred in refusing to allow the introduction of learned treatises for the purpose of cross-examining defendant's expert witnesses. We note an allegation of medical malpractice concerning the hospital's resuscitation procedures is not presented for review on this appeal.

As previously mentioned, this case arises under the Federal Tort Claims Act, 28 U.S.C. § 2671. The law of the State of Illinois controls because that is where the act or omission surrounding this case occurs. 28 U.S.C. 1346(b). The case of *Green v. Hussey*, 127 Ill.App.2d 174, 262 N.E.2d 156 (1970), has been uniformly recognized as the lead case in Illinois which articulates the standard to be applied in informed consent cases. (See, for example, *Ziegert v. South Chicago Community Hosp.*, 99 Ill.App.3d 83, 54 Ill.Dec. 585, 594, 425 N.E.2d 450, 459 (1981) for recognition of the authority attached to *Green,* supra.) [1] In *Green,* the Appellate Court of Illinois, First District, First Division stated:

"We conclude that to establish liability for defendants' failure to inform plaintiff of the foreseeable risks ..., plaintiff had the burden of proving by expert medical evidence that the reasonable medical practitioner of the same school, in the same or similar circumstances, would have told the patient of such risks, or that the disclosures as made by the defendants did not meet the standard of what a reasonable medical practitioner would have disclosed under the same or similar circumstances." See *Green,* supra, 262 N.E.2d at 161. (Citations omitted.)

---

**1.** See also *Guebard v. Jabaay,* 117 Ill.App.3d 1, 72 Ill.Dec. 498, 452 N.E.2d 751 (Ill.App. 2 Dist. 1983); *Casey v. Penn,* 45 Ill.App.3d 573, 584, 4 Ill.Dec. 346, 360 N.E.2d 93 (1977); *Miceikis v. Field,* 37 Ill.App.3d 763, 767, 347 N.E.2d 320 (1976).

This statement was more recently elaborated upon and endorsed in *Guebard v. Jabaay,* 117 Ill.App.3d 1, 72 Ill.Dec. 498, 452 N.E.2d 751 (1983):

"The reasonable physician or national standard simply measures the standard of physician disclosure by what a reasonable physician would disclose under the same or similar circumstances. (*Ziegert v. S. Chicago County Hosp.,* 99 Ill. App.3d 83, 92, 54 Ill.Dec. 585, 425 N.E.2d 450.) This is the rule in Illinois and remains the majority rule today. (See *Cowman v. Hornaday,* 329 N.W.2d 422, 425 (Iowa 1983); see also *Harnish v. Children's Hosp. Med. Center,* 387 Mass. 152, 439 N.E.2d 240, 243 n. 4 (collecting cases from 13 other jurisdictions).) This rule substitutes a national standard of reasonable and ordinary care for the traditional locality standard. (*Cross v. Trapp,* 294 S.E.2d 446, 451 [ (W.Va.1982) ] *citing* 82 W.Va.L.Rev. 251, 275 (1979).)"

Plaintiff does not argue along the lines that a reasonable medical practitioner at a civilian hospital under similar circumstances would have told Mr. Pardy about the severe medical risks associated with an I.V.P. test. Indeed, this hypothesis is simply not supported by the expert medical testimony at trial. Instead, plaintiff argues the standard of care to be applied in this case is that applied to military hospitals established by the "Patient's Bill of Rights" manual published by the American Hospital Association as well as another "patient's right to know" guideline established by the Joint Commission on Accreditation of Hospitals. These "Bill of Rights" documents state in pertinent part:

"The patient has a right to obtain from his physician complete, current information concerning his diagnosis, treatment and prognosis in terms the patient can reasonably understand. When it is not medically advisable to give such information to the patient, the information should be made available to an appropriate person in his behalf. (T.R. 317)

\* \* \* \* \* \*

"The patient has the right to receive from his physician information necessary to give informed consent prior to the start of any procedure and/or treatment. Except in emergencies, such information for informed consent should include but not necessarily limited to the specific procedure and/or treatment, and medically significant risks involved, and the probable duration of the incapacitation." (T.R. 318)

Plaintiff concludes that the testimony of Dr. William Gregory, Chief of Hospital Services at SAFB, that the above "Bill of Rights" statement is a part of SAFB hospital policy, must lead a court to conclude a proper "informed consent" surrounding the I.V.P. test was not obtained from Mr. Pardy. We disagree. While Dr. Gregory stated the above "Bill of Rights" statement was part of SAFB hospital policy, he also stated that failure to inform Mr. Pardy of the severe (yet remote) risks connected with an I.V.P. test did not deviate from the reasonable, acceptable standard of medical care. The remainder of the medical testimony supports such an opinion. For example, Dr. Bruce Vest testified it was not standard medical practice to get an informed consent from a patient before an I.V.P. test. This is because informing the patient of such severe risks, in his opinion, increased the chances of their occurrence.[2] The testimony of Drs. Gregory and Vest is

---

**2.** This falls in line with the philosophy enunciated in *Miceikis v. Field,* 37 Ill.App.3d 763, 347 N.E.2d 320, 324 (1976), where the Illinois Appellate Court stated:

"... it would be too onerous a burden to place upon a physician the duty of disclosing every conceivable risk which possibly could develop. As the expert testimony revealed in the present case, excessive disclosure of remote risks would tend to do more harm than good to the patient. A doctor has a special relationship with his patient. (See *Cannell v. Medical and Surgical Clinic,* S.C. (1974), 21 Ill.App.3d 383, 315 N.E.2d 278.) This relationship not only vests the doctor with the responsibility of disclosure, but also requires the doctor to exercise discretion in prudently disclosing information in accordance with the patient's best interests."

in conformity with the opinions of attending physicians Kelso and Daley, both of whom stated an informed consent is inappropriate before an I.V.P. is administered. In contrast to the opinions of these four doctors—Gregory, Vest, Kelso and Daley—the record reveals plaintiff failed to produce a single medical expert who stated the failure to inform Mr. Pardy of the severe risks of an I.V.P. test deviated from acceptable medical practice.

■ Ultimately, we must conclude that the appropriate standard of medical practice at SAFB was what a reasonable physician would disclose under similar circumstances. This reasonable physician, or national standard, is what the courts of Illinois, through *Green, Ziegert* and *Guebard,* supra, dictate as the barometer as to whether medical practice/negligence occurred. What controls, according to Illinois courts, controls this case under 28 U.S.C. 1346(b). The broad, ambiguous language surrounding the Bill of Rights statements is not controlling. Plaintiff has failed to meet his burden under Illinois law because he has failed to advance material, expert medical testimony to support his position.

■ Plaintiff asks us to employ the "similar locality" rule found in *Bartimus v. Paxton Community Hospital,* 120 Ill. App.3d 1060, 76 Ill.Dec. 418, 458 N.E.2d 1072 (1983), and suggests this rule, not the reasonable physician/national standard rule, controls in Illinois. However, the application of the *Bartimus* "similar locality" rule occurs only under extremely limited circumstances. It is an exception to the rule formulated in *Green,* supra. In *Bartimus* the issue was whether a doctor from a distant urban community familiar with urban emergency room procedures was qualified to testify as an expert on the standard of medical care acceptable in the emergency room of a much smaller town. The doctor in question admitted he had only practiced medicine in large urban areas and had no familiarity with medical practice in a smaller community like the one at issue.

He also admitted he had never worked in the emergency room of a hospital where physicians were "on call." The court in *Bartimus* employed a "similar locality" exception to the *Green* doctrine to conclude the admission of the urban doctor's testimony as an expert was error because a proper foundation had not been laid.

■ Plaintiff seizes upon the "similar locality" language in *Bartimus* to conclude the medical evidence at trial was off base in discussing reasonable physician or national standards and instead should have focused on the "similar locality" standards, which in our case plaintiff asserts are standards employed at military hospitals, evidenced by the "Bill of Rights" policy statements above. Yet we conclude the *Bartimus* "similar locality" rule is merely an exception to the reasonable physician/national standard criteria and the latter standard is the law in Illinois as enunciated in the *Green, Ziegert* and *Guebard* line of cases, supra. We note no other Illinois court has adopted the *Bartimus* rule in adjudicating a case with circumstances and facts similar to the case at bar. Therefore, plaintiff's focus on *Bartimus* is misguided.

Finally, we note Dr. Gregory did state that the Bill of Rights statement regarding *information necessary* to give an informed consent was SAFB policy, as plaintiff contends. However, Dr. Gregory never agreed with the proposition that an informed consent *itself* was necessary before performing the I.V.P. If the informed consent itself is not necessary, then the information necessary for a sufficient informed consent in general becomes irrelevant in the case at bar. At the end, plaintiff's usage of the Gregory testimony along these lines and his general reliance on the Bill of Rights statements cannot create legally binding medical standards at SAFB in a vacuum without substantial, material expert medical testimony supportive of the notion that the accepted standard of medical care in Illinois, in this case the "reason-

able physician" standard', was deviated from in this instance.[3]

Plaintiff also believes the district court erred in its ruling on the causation issue. Plaintiff believes the evidence at trial supports the conclusion that the failure to inform Mr. Pardy of the severe risks of an I.V.P. procedure proximately caused Mr. Pardy's injury. Plaintiff bases his argument in this area on two fronts. The first is the fact that Mr. Pardy testified at trial that, if informed, he would have refused to take the I.V.P. Mr. Pardy specifically stated, "I definitely wouldn't have taken something that would have killed me." (See plaintiff's brief, p. 19.) Plaintiff also argues that the fact that Mr. Pardy felt much better the day the I.V.P. was to be administered necessarily means he would have refused to take the test. Plaintiff believes the above, coupled with the fact that defendant offered no evidence to contradict Mr. Pardy, should have led the district court to rule for Mr. Pardy on the causation issue.

■ This argument must fail. In *Guebard,* supra, it was stated that in Illinois causation in an informed consent case is determined by an objective standard, i.e., what a prudent person in plaintiff's position would have decided if adequately informed. (See 72 Ill.Dec. at 505, 452 N.E.2d at 757.) We note Mr. Pardy's recent medical upturn over the period of a few days does not necessarily mean he had recovered from his ailments. Further, we refuse to so definitively conclude, as plaintiff does, that a reasonable person in Mr. Pardy's position would have refused the investigatory I.V.P. to determine the cause of his recent illness. Most importantly, Mr. Pardy's personal statement that he would not have taken the test if informed is insuffi-

cient proof for ruling in his favor on the causation issue. As stated in *St. Gemme v. Tomlin,* 118 Ill.App.3d 766, 74 Ill.Dec. 264, 455 N.E.2d 294 (1983):

> "The patient-plaintiff may testify on this subject but the issue extends beyond his credibility. Since at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment. Subjectively he may believe so, with the 20/20 vision of hindsight, but we doubt that justice will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment." 74 Ill.Dec. at 266, 455 N.E.2d at 296.

In sum, plaintiff has not met his burden of proof demanded by the objective proximate cause test in this area in Illinois. The sole testimony of Mr. Pardy that he wouldn't have taken the I.V.P. test is insufficient.

Plaintiff's final argument concerns the district court's failure to admit into evidence learned medical treatises for the purpose of cross-examining one of defendant's expert witnesses. Plaintiff claims he offered the treatises "merely to show that there were two conflicting opinions in the medical community concerning the proper procedure to be observed." (Plaintiff's brief, p. 16.) For reasons stated above, we believe a single reasonable physician/national standard was to be employed in this case. There is no conflicting medical testimony that the standard of care given to Mr. Pardy at SAFB deviated from the reasonable physician/national standard. Hence, assuming *arguendo* there was an evidentiary error in excluding the treatises

---

3. See, similarly, *Ziegert,* supra, a case relied upon by plaintiff, where it is stated:

> "We cannot agree the failure to follow Hospital bylaws establishes negligence by the defendants. While hospital bylaws and regulations are admissible as evidence of negligence, they do not 'conclusively determine the standard of care * * *.' (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill.2d 326, 332, 211 N.E.2d 253, cert. denied, 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209.)

> Rather, such regulations are only part of the evidence to be considered by the jury. A plaintiff must prove not only the violation of the bylaws, but that such violation proximately caused the injury to the plaintiff. *Eckley v. St. Therese Hospital* (1978), 62 Ill.App.3d 299, 305–06, 19 Ill.Dec. 642, 379 N.E.2d 306, *leave to appeal denied,* 71 Ill.2d 617, citing *Ybarra v. Cross* (1974), 22 Ill.App.3d 638, 644–45, 317 N.E.2d 621." 54 Ill.Dec. at 597, 425 N.E.2d at 462.

to impeach defendant's expert witnesses to prove there were two acceptable standards as to informed consent in the St. Louis medical community, it was harmless error.

For the reasons set forth above, the decision of the district court is AFFIRMED.