**Harriet Green, Plaintiff-Appellant, v. Frank L. Hussey, M.D., and Lutheran General and Deaconess Hospitals, an Illinois Corporation, Defendants-Appellees.**

Gen. No. 53,715.

First District, First Division.

June 29, 1970.

Smith and Munson, of Chicago (Lester E. Munson and Lester E. Munson, Jr., of counsel), for appellant.

Howard and French, of Chicago (Richard G. French, of counsel), and Hinshaw, Culbertson, Moelmann, Hoban and Fuller, of Chicago (John M. Moelmann and D. Kendall Griffith, of counsel), for appellees.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is a medical malpractice action. Plaintiff alleged that defendants, subsequent to breast cancer surgery and without first obtaining plaintiff's "informed consent," undertook a postoperation series of cobalt and X-ray treatments on her, which damaged her severely. The issue presented for review is whether the trial court properly directed a verdict in favor of defendants at the close of plaintiff's case.

The record shows that in April 1962, Dr. C. David Brown, after a diagnosis that a tumor was malignant,

surgically removed a breast of plaintiff. No evidence was found that the cancer had spread beyond the breast area, and plaintiff was turned over to the hospital's radiology department for radiation therapy. After thirty treatments, the therapy was ended. Plaintiff claims that these treatments resulted in damage to plaintiff's heart and right lung and caused her involuntary retirement due to physical disability from the U. S. Post Office.

Plaintiff asserts that "defendants' liability is based not upon a lack of care but upon an utter failure to obtain the patient's consent to the treatment. The facts of defendants' liability are found not in what happened during the treatment, but in what happened before the treatment was begun." Plaintiff contends that she was entitled to know the foreseeable results before the treatment was undertaken, and "defendant's failure to inform Miss Green of the risks involved in X-ray and cobalt therapy amounts to a failure to obtain the necessary consent. A specific consent was obtained for the biopsy, which proved the tumor to be malignant. Another specific consent was obtained for the simple mastectomy. But no consent, neither written nor oral nor implied, was obtained for the radiation therapy."

Plaintiff testified and denied any consent to the radiation therapy. She said that her surgeon, Dr. Brown, told her he knew nothing about radiology, and she would be turned over to the X-ray department as the next step in her treatment. On plaintiff's first visit to the radiation department of Lutheran General Hospital, she met Dr. Sam Mulopulos, an employee of defendant Hussey. Dr. Mulopulos initiated the radiation therapy. Although he conversed with plaintiff on her initial visit, their discussion amounted to little more than a guided tour of the cobalt treatment room. After examining plaintiff, Dr. Mulopulos showed her the cobalt room and told her she would be left alone in the room during the treatment

and described some of the noises she could expect to hear from the equipment. Plaintiff asserts that "she was *asked* nothing. She was *told* that she was going to be receiving cobalt radiation treatments."

Plaintiff further testified that a few days later Dr. Koptik, another employee of defendant Hussey, took over treatment of plaintiff at Lutheran Deaconess Hospital, an institution operated by the same defendants, but located nearer to plaintiff's home. Lois Hanson, a technician, testified that Dr. Koptik told plaintiff that the therapy would be continued, and that she had nothing to worry about. The only question asked of plaintiff by Dr. Koptik was what she had already been told.

Dr. Mulopulos was called by plaintiff under section 60 of the Civil Practice Act, and his testimony included the following:

Q. "Did you do anything further with the patient on April 26, 1962?"

A. "We discussed what would be done as far as her treatment."

Q. "All right, what did you say to her and what did she say to you, doctor?"

A. "We told her that she was referred for radiation therapy by Doctor Brown, and as was our custom, this meant that we would treat several areas of her body, and this would require treatment for at least four weeks, and that during that time, she may have some changes. It wasn't required that she have all the changes, but she may have some symptoms. It may not be required that she have all the symptons, some patients do have just nausea, some patients do have some loss in appetite, some patients do have difficulty in swallowing with the treatment, some patients may have skin change, they may not have skin change, may be temporary.

That when we do treat, we treat as a form of insurance to make sure that if there were any cancer in the area that we are treating, that we attempt to take care of the cancer that might be there, and that it should be understood that this area we are treating will encompass some normal tissue, that in the treatment of the area, in order to produce changes to the cancer, there must be some changes to the normal tissue. When she goes into the room, she will feel nothing as far as the treatment is concerned, yet any changes that take place will be changes that will occur later on in the treatment, any discomfort in swallowing usually occurs after several weeks, and that Doctor Brown has asked us to treat her and that we thought this would be the best treatment for her."

. . . . . .

Q. "Were you the only doctor who talked with Mrs. Green as she commenced her radiation therapy treatment there at Lutheran General Hospital?"

A. "At the commencement of her treatment?"

Q. "Yes?"

A. "Yes, I was the only doctor. Doctor Brown referred her and then I started her treatment."

. . . . . .

Q. "Did you explain to her any possible alternative method of treatment?"

A. "I don't think there was any alternative method, other than radiation therapy."

Q. "And, did you explain to her the effect and the nature of the treatment on the area?"

A. "Yes, sir."

Q. "Now, after all of this, what did she say?"

A. "She approved, and we said we would begin our treatment on the following Monday, when the dressings were removed."

Plaintiff maintains she was told nothing about the possible risks and nothing about the inevitable results, and she heard nothing about the alternatives until the trial of the case. Plaintiff asserts that the explanation of the proposed treatment to be given to her was not to inform her or help her understand the treatment. It was an explanation designed to help the personnel administering the treatment, and it was not until after the treatments that plaintiff was told by Dr. Brown, her surgeon, that the treatment was designed to kill any stray cancer cells.

Plaintiff contends that "the rule of law to be applied to these circumstances is clear. A physician who fails to obtain his patient's consent to treatment must answer for the resulting damages." Plaintiff's authorities include Pratt v. Davis, 224 Ill 300, 79 NE 562 (1906), where the court said that an operation without the authority or consent of the patient constituted a trespass to her person. Also, Church v. Adler, 350 Ill App 471, 113 NE 2d 327 (1953), at page 483:

"The surgeon's removal of the plaintiff's appendix without her consent is a tort."

Also, Schloendorff v. Society of New York Hospital, 211 NY 125, 105 NE 92 (1914), where it is said (p 93):

". . . a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages."

Plaintiff further contends that a patient cannot consent without information, and it is the doctor's duty to

give the patient enough information to make sure the patient understands the treatment, which must include (1) an explanation of the proposed treatment; (2) information of the alternatives available and the physician's preference; and (3) information as to the foreseeable risks and results consistent with the physician's duty of care and skill.

Plaintiff's authorities on the basic contention that the patient must know the risks and results before any "informed consent" is possible include Natanson v. Kline, 186 Kan 393, 350 P2d 1093 (1960), where it is said (p 1106):

> "We think upon all the facts and circumstances here presented Dr. Kline was obligated to make a reasonable disclosure to the appellant of the nature and probable consequences of the suggested or recommended cobalt irradiation treatment, and he was also obligated to make a reasonable disclosure of the dangers within his knowledge which were incident to, or possible in, the treatment he proposed to administer."

Also, Scott v. Wilson (Tex), 396 SW2d 532 (1965), where it is said (p 533):

> "[I]t was the doctor's duty to inform him of the nature of the operation, the processes contemplated, and the dangers and hazards of the operation and the chances of restored hearing, so as to enable Scott to determine whether he wanted to risk the operation or to live with his impaired hearing."

Plaintiff summarizes her contentions as follows: "The physician must obtain the patient's consent before the treatment begins. Before the plaintiff can consent, the patient must understand the treatment. The elements of the patient's understanding have been defined by the courts in Illinois and are outlined in this brief. Plain-

tiff's evidence clearly shows defendants' failure to inform plaintiff on each of the elements of understanding," and "despite this uncontradicted evidence, the trial court directed a verdict for defendants at the close of plaintiff's case." Plaintiff asserts, in view of the foregoing, a new trial must be granted.

Defendants contend that an "informed consent" does not mean that a patient must completely understand the nature of the treatment, including all the risks and hazards; that discretion must be used by the physician in determining the extent of the disclosure to the patient, and in some instances a complete disclosure would constitute bad medical practice. Williams v. Menehan, 191 Kan 6, 379 P2d 292, 294 (1963).

Defendants assert that disclosure of risk incident to proposed treatment is a separate problem with each patient. Consequently, the adequacy of disclosures given a patient is a matter of medical judgment which a jury cannot evaluate in the absence of expert testimony, and "the duty to inform, the nature of the information, and the extent of it is all outside of the knowledge and experience of the jury and can only be the subject of expert testimony." Defendants state that no expert medical testimony was offered by plaintiff in the instant case, and the jury, being laymen, would have had no way of determining whether, under the circumstances, the information given plaintiff was adequate to allow her to make an intelligent decision regarding the radiation treatment.

Defendants note there are no Illinois cases involving "informed consent"; that in medical malpractice cases Illinois has required the plaintiff to prove by "affirmative expert evidence" that the physician was unskillful or negligent. See Graham v. St. Luke's Hospital, 46 Ill App2d 147, 156, 196 NE2d 355 (1964), and Dimitrijevic v. Chicago Wesley Memorial Hospital, 92 Ill App2d 251, 257, 236 NE2d 309 (1968). Defendants assert that those

181

courts which have considered the "informed consent" theory require the plaintiff to offer expert testimony that the defendant's disclosures are not in accordance with those a reasonable medical practitioner would make under similar circumstances. Cited cases include Rea v. Gaulke (Tex), 442 SW2d 826 (1969), and Aiken v. Clary (Mo), 396 SW2d 668 (1965). In Rea v. Gaulke, the court stated (p 831):

> "There are situations wherein a doctor's failure to inform a patient of certain risks incident to a diagnosis or proposed treatment, in obtaining his consent, may be actionable. However, in establishing liability for such failure, the patient has the burden of proving by expert medical evidence that the reasonable medical practitioner of the same school in the same or similar circumstances, would have told the patient of such risks. The patient also has the burden of proving by expert medical evidence that such failure was a proximate cause of his damage."

In Aiken v. Clary, the court stated (p 673):

> "The basic philosophy in malpractice cases is that the doctor is negligent by reason of the fact that he has failed to adhere to a standard of reasonable medical care, and that consequently the service rendered was substandard and negligent. In our judgment, this is true whether the alleged malpractice consists of improper care and treatment . . . or whether it is based, as here, on an alleged failure to inform the patient sufficiently to enable him to make a judgment and give an informed consent if he concludes to accept the recommended treatment.

> "How, then, is a jury to determine whether a physician has been negligent in failing to inform his patient adequately to enable him to make an in-

formed decision whether to consent to recommended treatment?"

And at page 675:

"[W]e hold that plaintiff, in order to sustain his burden of proof, is required to offer expert testimony to show what disclosures a reasonable medical practitioner, under the same or similar circumstances, would have made, or, stated another way, that the disclosures as made by the defendant do not meet the standard of what a reasonable medical practitioner would have disclosed under the same or similar circumstances."

Defendants also contend that proximate cause is a necessary element in a medical malpractice action based upon failure to obtain an informed consent; if plaintiff would have submitted to the treatment even if a full disclosure had been made and she was warned of the risks and hazards, then the failure to disclose to her the risk of the treatment would not be the proximate cause of her injuries. Natanson v. Kline.

Defendants assert plaintiff offered no evidence of what she would have done if the risks and hazards of the treatment had been disclosed to her. On cross-examination, she was asked whether she would have refused the treatment if she had been told that it might cause fibrosis of the lung. Her counsel objected to this question, and it was never answered.

In sum, defendants argue that plaintiff offered no evidence on two essential elements of her cause of action. There was no expert evidence of what a reasonable physician in the same community, under similar circumstances, would disclose regarding the risks and hazards of radiation therapy, nor was there any evidence on the issue of proximate cause, and in the absence of direct evidence or circumstantial evidence

from which inferences of fact clearly preponderate supporting each essential element of plaintiff's case, the issue of liability should not be submitted to the jury. Tiffin v. The Great A. & P. Tea Co., 18 Ill2d 48, 60, 162 NE2d 406 (1959).

Defendants also assert that the evidence showed that there was no alternative method of treatment, either before the trial or during it, and that plaintiff's examination of Dr. Mulopulos on this point brought the response, "I don't think there was any alternative method, other than radiation therapy."

██ After a consideration of the various authorities offered by both sides, we agree with plaintiff that the instant situation should be examined and considered under the "informed consent" theory. However, because cobalt treatments are not matters of common knowledge or within the experience of laymen, we believe expert medical testimony thereon was just as necessary as is such testimony on the correctness of the handling of cases involving surgery or treatment. (Aiken v. Clary.) Also, we think the instant situation comes within the pattern and guidelines set forth in Graham v. St. Luke's Hospital and Dimitrijevic v. Chicago Wesley Memorial Hospital.

██ We conclude that to establish liability for defendants' failure to inform plaintiff of the foreseeable risks or results involved in X-ray and cobalt therapy and available alternatives, if any, plaintiff had the burden of proving by expert medical evidence that the reasonable medical practitioner of the same school, in the same or similar circumstances, would have told the patient of such risks, or that the disclosures as made by the defendants did not meet the standard of what a reasonable medical practitioner would have disclosed under the same or similar circumstances. (Aiken v. Clary.)

Also, plaintiff had the burden of proving by expert medical testimony that such failure was the proximate cause of her damage.

In the instant case expert medical testimony was required of plaintiff to make a prima facie case under the "informed consent" theory. No such evidence was offered by plaintiff, and we hold that the trial court properly directed a verdict in favor of defendants at the close of plaintiff's case.

For the reasons given, the judgment of the Circuit Court is affirmed.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.