FELIX MICEIKIS, Plaintiff-Appellant, *v.* DR. ROBERT E. FIELD, Defendant-Appellee.

First District (3rd Division)    No. 60809

Opinion filed April 1, 1976.

Lane, Falasz, Pollman & Munday, of Chicago (Thomas L. Trinley, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Kevin T. Martin, James P. Dorr, and Helaine W. Heydemann, of counsel), for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Felix Miceikis, brought this action for personal injuries against Ingalls Memorial Hospital and Dr. Robert E. Field. During a jury trial in the circuit court of Cook County, plaintiff voluntarily dismissed his action against the hospital. The cause proceeded only against Dr. Field (hereinafter defendant). The jury returned a verdict in favor of defendant, and the trial court entered judgment on the verdict. The court denied plaintiff's post-trial motions, and this appeal follows.

The complaint, in several counts, charged defendant with negligence and with failure to inform plaintiff of the risks and alternatives to a certain surgical procedure so that plaintiff was unable to give an informed consent to the operation in question. After all the evidence had been presented and during the instructions conference, plaintiff dismissed all counts except the one referring to lack of informed consent.

The tip of plaintiff's finger was severed from his hand in an employment-related incident on October 31, 1967. Plaintiff's supervisor immediately transported him to the hospital, and brought the severed finger along in a glass of liquid. At the hospital defendant reimplanted the severed finger back onto the hand. Subsequently, complications arose, and a series of further operations was performed on the hand, resulting in the eventual removal of the entire finger.

Plaintiff's initial contact with defendant occurred in the emergency room of the hospital. The parties offer conflicting accounts of this encounter. Plaintiff testified that, although he told defendant that he preferred the finger tip to be left off defendant replied that he was the doctor and reimplanted the tip. Plaintiff further testified that defendant did warn him that more of the finger might have to be amputated later, but said he gave no other information regarding the operation. On cross-examination, plaintiff stated that although defendant fully explained what the treatment would be, the latter did not comment further on it, nor did he disclose any risks.

Defendant, examined under section 60 of the Civil Practice Act, testified that plaintiff expressly requested reimplantation and that he acquiesced after informing plaintiff that the tissue probably would not survive. Defendant, who had extensive training and experience in hand surgery, believed that reimplantation did not violate good medical practice. Defendant also testified that he had disclosed the alternative of leaving the tip off. In his own behalf, defendant stated that plaintiff was informed of a possibility of success existing, but that the skin graft

probably would not take. Defendant did not explain to plaintiff that a neuroma possibly could develop. A neuroma is a mass of nerve tissue in an amputation stump resulting from the abnormal regrowth of the stumps of severed nerves. It generally takes the form of a mass or tumor sprouting from a nerve. Defendant's reason for not mentioning this possible risk was his belief that the chances of neuroma developing were not increased by a reimplantation. Defendant testified to advising plaintiff that if the graft failed, that time would be lost, an amputation would be required, and the stump would have to be revised. Defendant testified that he had disclosed the alternative of leaving the tip off or of closing it in some other way.

Jane McGann, the nurse assigned to the hospital emergency room, was the sole witness to the initial meeting between the parties. She testified that plaintiff requested the reimplantation of the finger tip, and that defendant explained the procedure to him. Plaintiff was informed that the graft might not take, and if not, that further amputation would be required. On cross-examination, the nurse could not recall any other particulars concerning the incident.

A copy of the hospital's standard consent form, signed by plaintiff, was introduced into evidence by the hospital. The form in substance recited that the nature of the operation, alternatives, risks, and possible complications had been explained. The nurse testified that it was common hospital practice for doctors to disclose risks of an impending operation and to explain procedures and possible alternatives.

A sizable body of expert testimony was introduced at trial by both parties. For purposes of this opinion, only a brief survey of that testimony relevant to the issue of informed consent need be set forth. Plaintiff's first expert witness, Dr. John Noble, treated plaintiff after the initial operation by defendant and enumerated the subsequent operations necessitated by the complications with the nerve endings. He also testified that a neuroma can occur from any injury which severs the nerves, as well as from surgical procedures. Dr. Donald Miller testified for plaintiff that a physician in similar circumstances should have explained the surgical procedures, potential risks, and possible alternative methods. In his opinion, the risk of the disease process spreading more proximally was present and such risk should have been divulged to the patient. He also believed that the risk of neuroma which could necessitate further amputation should have been disclosed. On cross-examination, Dr. Miller stated that a neuroma could develop from any trauma to the nerve. He conceded that he had no way of determining whether plaintiff's neuroma resulted from the injury or from the operation. Dr. Carlos Scuderi, another expert witness for plaintiff, testified that he felt a relationship existed between the neuroma and the initial surgery, but that no way

exists to determine the specific origin of the neuroma or of causalgia, a burning pain which frequently follows gunshot wounds, lacerations, and similar injuries. He was not sure if the causalgia most likely would develop after a single injury or a series of operations. Plaintiff's final expert witness, Dr. William Fitzsimmons, testified that four viable alternatives to the treatment administered existed. The alternatives should have been presented to plaintiff. Reimplantation is one of the two most common methods of treatment. The witness emphasized that he believed no existing risks should have been presented to plaintiff because gangrene existed as a risk in any of the methods of care. Neuroma and causalgia also can develop despite the best medical treatment.

Dr. William Tansey, defendant's first expert witness, upheld the doctor's actions when confronted with a hypothetical question. He believed that the physician had adequately informed the patient of risk, and that under the circumstances there was no other information to be given the patient. Dr. Elia Tobias testified that the doctor need not have divulged the possibility of neuroma in this instance, as it may have developed irrespective of the operation. In his opinion, it is not good medical practice to recount every potential complication in each case as it could be frightening and at odds with the patient's best interest. Defendant's final expert witness, Dr. Shahan Serrafin, agreed with prior testimony that the hypothetical doctor had acted properly and had omitted no vital information in his discussion with the patient.

On appeal, plaintiff contends that throughout the trial defense counsel misstated the controlling law in the presence of the jury, thereby prejudicing plaintiff; that the trial court erred in the giving and refusal of certain instructions to the jury; that the court erred in several evidentiary rulings; and that the court erred in not directing a verdict in plaintiff's favor or in not granting him a judgment *n.o.v.*

■■■ Plaintiff's initial contention is that defense counsel prejudiced the jury through statements that only "material" risks need be disclosed by a physician to allow a patient to intelligently consent to the surgical procedure employed. This argument requires a brief discussion of the law governing informed consent in Illinois. The leading case on the subject is *Green v. Hussey* (1970), 127 Ill. App. 2d 174, 262 N.E.2d 156. That decision embraces the view of a majority of courts in establishing a duty to disclose to a patient a collateral risk about which the doctor knew or should have known. The problem lies in determining the extent to which risks must be disclosed. In *Green,* the court, at page 184, created a standard under which a doctor would be protected:

> "We conclude that * * * plaintiff had the burden of proving by expert medical evidence that the reasonable medical practitioner of the same school, in the same or similar circumstances, would

have told the patient of such risks, or that the disclosures as made by the defendants did not meet the standard of what a reasonable medical practitioner would have disclosed under the same or similar circumstances."

The court thereupon affirmed a directed verdict for defendants at the close of plaintiff's case for failure to establish a standard of disclosure of risks since no expert medical testimony was adduced at trial. *Green* imposed the limitation of foreseeable risks, but did not comment on materiality. In our view, it would be too onerous a burden to place upon a physician the duty of disclosing every conceivable risk which possibly could develop. As the expert testimony revealed in the present case, excessive disclosure of remote risks would tend to do more harm than good to the patient. A doctor has a special relationship with his patient. (See *Cannell v. Medical & Surgical Clinic, S.C.* (1974), 21 Ill. App. 3d 383, 315 N.E.2d 278.) This relationship not only vests the doctor with the responsibility of disclosure, but also requires the doctor to exercise discretion in prudently disclosing information in accordance with his patient's best interests. To disclose more than that which is material would run counter to the responsibility assumed through the doctor-patient relationship. This view has been adopted by a number of courts which have considered the problem. (See *Cobbs v. Grant* (1972), 8 Cal. 3d 229, 502 P.2d 1, 104 Cal. Rptr. 505; *Aiken v. Clary* (Mo. 1965), 396 S.W.2d 668; *Haven v. Randolph* (D.D.C. 1972), 342 F. Supp. 538, *aff'd* (D.C. Cir. 1974), 494 F.2d 1069.) It is also in accord with several commentaries. (See Waltz & Scheuneman, *Informed Consent to Therapy,* 64 Nw. U.L. Rev. 628 (1970); Holmstrom, *Informed Consent: Alternatives for Illinois,* 1973 U. Ill. L.F. 739.) This standard of disclosure, as established through expert medical testimony, would define the doctor's duty as informing of those factors, either alone or in combination with other factors, which the patient would view as significant enough as to influence his decision of whether or not to consent to therapy. In view of the foregoing, defense counsel did not misstate the law in his references to material risks. We also must observe that these references during the trial were few, and that most of them were made by counsel for the hospital.

■■ Plaintiff also contends that defense counsel improperly confused the jury by referring to the fact that defendant had performed the operation skillfully. Plaintiff argues that skill applies only to a malpractice action, not to a suit involving informed consent. This argument overlooks the fact that this action not only alleged lack of informed consent, but it also charged defendant with negligence as well as lack of consent to the specific procedure employed. It was not until all the evidence had been adduced that plaintiff moved to strike all the counts except that of informed consent. Therefore, defendant was within his rights in

defending against all allegations confronting him, and the references to defendant's skill during trial were proper.

■■ Defendant's final claim that defense counsel distorted the law concerns itself with comments made by defense counsel during closing argument. It is difficult to summarize plaintiff's contention without setting out in full the closing arguments made by both sides. However, plaintiff refers to six passages in defense counsel's closing argument in which plaintiff charges that defendant attacked the concept and policy of the doctrine of informed consent. Although we do not find defendant's closing argument to have constituted such an attack, it is sufficient to observe that plaintiff failed to object to any of the remarks made by defense counsel. Failure to object to the remarks waives the issue for appeal. *McElroy v. Force* (1967), 38 Ill. 2d 528, 232 N.E.2d 708; *Jamison v. Lambke* (1974), 21 Ill. App. 3d 629, 316 N.E.2d 93.

■■ Plaintiff's next contention is that the trial court erred in the giving and refusal of certain jury instructions. Plaintiff first argues that the court erred in refusing the issues instruction offered by him, and in giving the issues instruction offered by defendant. Defendant's instruction stated the issues as follows:

> A. He did not make a reasonable disclosure to the plaintiff of the risks.
>
> B. He failed to disclose alternative methods of treatment.

In our view, defendant's instruction clearly and simply states the law according to the specific language of *Green*. Plaintiff's proposed issues instruction included eleven separate acts or omissions of defendant, any one of which allegedly would result in liability. However the instruction included the necessity of informing of risks which the expert testimony on both sides clearly considered to be connected only remotely to the operation. Moreover if connected, it would be impossible to determine the source of the complication. Plaintiff's proposed issues instructions thus contained critical defects. The instruction given was clear and correct.

■■■ Plaintiff also urges that the trial court incorrectly gave a duty instruction offered by defendant instead of the instruction offered by plaintiff. Both sides submitted an instruction which was a modification of IPI 105.01. The trial court gave defendant's instruction which added the following sentence to the aforementioned instruction:

> "The law does not say how a reasonable careful doctor would act under those circumstances; that is for you to decide."

This sentence in conjunction with the remainder of the instruction informed the jury that no strict legal standard existed which would be applied; that the jury must determine the scope of the standard; that the expert medical testimony must be the basis of their determination; and

that they were warned not to use any personal knowledge in this formulation. We believe this instruction constitutes a fair and correct statement of the law in Illinois. While plaintiff's proposed instruction correctly concerned itself with the doctrine of informed consent, the jury was adequately instructed on this principle of law elsewhere in the instructions. It is not error to refuse an instruction if the principle of law embodied therein is adequately stated elsewhere in the instructions. (*Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 158 N.E.2d 63; *Garrett v. Babb* (1975), 24 Ill. App. 3d 941, 322 N.E.2d 217.) Moreover, it is within the trial court's discretion to determine the form in which an instruction shall be given. (*Schmidt v. Blackwell* (1973), 15 Ill. App. 3d 190, 304 N.E.2d 113.) The ultimate test for jury instructions is whether they formulate a clear and adequate picture of the applicable law when viewed in their entirety. (*Bittner v. Wheel Horse Products, Inc.* (1975), 28 Ill. App. 3d 44, 328 N.E.2d 160.) We believe that the instructions given in the present case, when viewed as a whole, were satisfactory and do not constitute reversible error.

Defendant's third contention is that the trial court committed reversible error in several evidentiary rulings. The first such ruling concerns plaintiff's request during trial for the reports of the emergency room committee of the hospital for the prior six months. Plaintiff maintained that such reports were necessary to determine the standard of disclosure at the hospital. When plaintiff was informed by counsel for the hospital that no such reports existed in that time period, plaintiff amended his request to include the preceding five years. The trial judge denied the request. The record does not disclose whether, in fact, such reports exist.

■■ We are cognizant of the great latitude afforded discovery and the production of documents. (*Monier v. Chamberlain* (1966), 35 Ill. 2d 351, 221 N.E.2d 410.) However, the trial judge possesses broad discretionary powers in controlling the extent of this scope. (*People ex rel. General Motors Corp. v. Bua* (1967), 37 Ill. 2d 180, 226 N.E.2d 6; *Savitch v. Allman* (1975), 25 Ill. App. 3d 864, 323 N.E.2d 435.) Courts of review will not disturb such rulings unless abuse clearly exists. (*Bender v. Pfotenhauer* (1974), 21 Ill. App. 3d 127, 315 N.E.2d 137.) Considering the extensive expert testimony contained in the record concerning the standard for disclosure of risks under *Green*, we find no abuse of the trial court's discretion in the denial of plaintiff's request. It should also be noted that plaintiff's request for five years of reports came in the midst of trial, was made to the hospital, and concerned the standard of disclosure of the hospital, which is not involved in this appeal.

The next evidentiary ruling complained of by plaintiff concerned his request to have defense counsel reduce to writing certain conversations

between that counsel and witnesses. The trial court correctly denied this motion as *Monier* clearly did not intend to extend to such lengths. *Monier* requires the reciprocal disclosure of all documents. This was accomplished in this case through an exchange of notes and documents by all parties involved. Defendant was under no duty to record all conversations which had not been previously set down in a writing.

■■ The third claimed evidentiary error concerns the trial court's refusal to allow plaintiff to cross-examine one of defendant's expert medical witnesses concerning his personal involvement as a defendant in a medical malpractice action. A greater latitude traditionally has been allowed in the cross-examination of expert witnesses as opposed to other witnesses, but the extent of such examination ordinarily rests in the discretion of the trial judge. (See *Muscarello v. Peterson* (1960), 20 Ill. 2d 548, 170 N.E.2d 564.) Having been the subject of prior malpractice litigation is of questionable relevance when weighing the doctor's testimony regarding the medical standard in the present case. We do not find the ruling to be an abuse of the trial court's discretion.

■■ Defendant next argues that the court erred in denying his request, made on the eighth day of trial, to take a second evidence deposition of a Dr. Boswick in Colorado. As part of his motion, plaintiff offered to fly defense counsel to Denver. In its determination of the motion, the trial court weighed several factors. Plaintiff's counsel previously had taken the doctor's evidence deposition limited to his treatment of plaintiff. Shortly before trial, plaintiff's counsel informed the defense that Dr. Boswick would testify as an expert. As a result, defense counsel took the doctor's discovery deposition in Colorado, and plaintiff's counsel was present. Plaintiff made no attempt to take an evidence deposition at that time. At trial, plaintiff offered the testimony of several expert witnesses. In view of these circumstances, the trial court did not abuse its discretion in denying plaintiff's belated request to take Dr. Boswick's second evidence deposition.

■■ Plaintiff's final contention that the trial court erred in denying his motion for a directed verdict or for judgment notwithstanding the verdict is without merit. There were numerous factual issues to be determined by the jury. The jury had to decide whether plaintiff's injuries were the proximate result of defendant's failure to disclose. Even plaintiff's expert witnesses testified as to the uncertainty in determining the cause of neuroma, causalgia, or gangrene in this or in a similar instance. Testimony revealed that any trauma to the nerve could result in complications. The causal connection between the alleged lack of informed consent and the revision surgery was properly a matter for the triers of fact.

Further, the record indicates a factual dispute as to whether or not the plaintiff insisted on the reimplantation technique. If he did so insist, that

factor would have had a bearing on the number of alternatives defendant would have been required to disclose. The standard of risks and alternatives was to be determined by the jury according to *Green*. The trial court correctly submitted the factual issues to the jury and properly denied plaintiff's motion for judgment notwithstanding the verdict.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

DEMPSEY and McGLOON, JJ., concur.