[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION TO SET ASIDE VERDICT
In the above action, sounding in medical malpractice, the plaintiff brought her complaint in two counts.
In the First Count, the plaintiff alleges that the defendant, Robert J. Gfeller, M.D., was a duly licensed obstetrician/gynecologist; that the plaintiff consulted him concerning complaints of pain during intercourse and that defendant made a diagnosis and prescribed Premarin vaginal cream. Subsequently, she was seen by said defendant who recommended a surgical procedure to wit, reverse perineorrhaphy and partial vulvectomy. Thereafter she was admitted to St. Francis Hospital, where said defendant performed the aforesaid procedures. Para. 5.
The Complaint then alleges (Para. 6) that the defendant Gfeller was negligent in failing to exercise due care in four respects:
a. failure to recommend conservative treatment, e.g. various creams and ointments;
b. choosing surgical procedures, overly radical and invasive;
c. failure to perform more conservative surgery, i.e, a simple hymenotomy;
d. failure to refer the plaintiff to a proctologist prior to surgery;
The Complaint also alleged (Para. 6 (e)) that said defendant failed to obtain the informed consent of the plaintiff to the surgical procedures.
The Second Count is against Ronald J. Czaja, M.D., likewise a duly licensed obstetrician/gynecologist. The count tracks the first count as to consultation, diagnosis, prescription of Premarin and recommendation of said operative procedures. The Second Count further alleges that both defendants shared office space and had jointly treated the plaintiff, both before and after the surgery.
Para. 6 of the Second Count is identical to Para. 5 of the First Count, to wit, that the defendant Czaja performed the CT Page 8426 surgery. The undisputed evidence was that Dr. Gfeller performed the surgery.
Para. 7 of the Second Count alleges that the defendant Czaja was aware of the admission of the plaintiff to the hospital and of the procedures to be performed.
Para. 9 of the Second Count is identical to Para. 6 of the First Count.
The plaintiff offered the testimony of both defendants and her expert witness, Dr. Stanley Leslie. Testimony was also received from Dr. Spear, a proctologist who treated the plaintiff after the above procedure, Dr. Veidenheimer, a colorectal specialist whose deposition was taken on videotape and the plaintiff herself. The plaintiff also offered the testimony of Dr. Chmieleski, a duly licensed obstetrician and gynecologist, who had been called by the defendants as an expert witness.
After the close of the plaintiff's case, the defendant offered the testimony of the defendants as to compliance with the standard of care in their treatment of the plaintiff.
After both sides had rested, the defendant moved for a directed verdict, on the grounds that the plaintiff had produced no credible evidence on the four specifications of due care and on the issue of informed consent. The court granted the motion as to the four specifications of lack of due care in the procedure followed by the defendants, and submitted the issue on informed consent to the jury. The jury thereafter returned a verdict against each doctor in the amount of $250,000.
The defendants have moved to set aside the verdict, and to have the court grant judgment for the defendants, n.o.v.
In their motion to set aside, the defendants make the following arguments.
 A.
The verdict was against the evidence, in that (1) There was no evidence that the defendants failed to disclose any viable alternatives to the procedure; (2) There was no evidence to support a finding of causation between the claims of injury to the plaintiff subsequent to the operation and any failure to disclose a viable alternative.
B. CT Page 8427
The verdict was against the law in that (1) There was no proof that a reasonable person would have foregone the operation had she been apprised of the alternative procedure; (2) There was no expert testimony that the procedure not disclosed would have cured the condition for which treatment was sought, and that failure to disclose the alternative did not meet the standard of care; (3) There was no expert testimony as to who had the obligation to obtain the informed consent; (4) The award against both doctors constitute double compensation for the same injury; (5) Since the duty to obtain informed consent is singular, a verdict against the other doctor cannot stand; (6) The plaintiff has failed to establish causation by expert testimony.
 C.
The verdict is excessive since it provides for double recovery for the same injury.
Facts
The jury could reasonably have found the following facts based on the evidence at trial. Shirley Weidl became a gynecological patient at the defendants' offices on June 14, 1986. At that time, she complained of painful intercourse and bleeding after. Dr. Czaja, after examination, arrived at a diagnosis of atrophic vulvo-vaginitis, and leukoplakia with stricture at the introitus. He prescribed Premarin cream, an estrogen replacement therapy, to avoid further vaginal atrophy. Mrs. Weidl returned to the office on July 30, 1986, showing excellent results of her vaginal atrophy from the Premarin cream, and it was suggested that she could now attempt resumption of intercourse.
On September 10, 1986, Mrs. Weidl saw Dr. Gfeller and complained that she could not have intercourse because of exquisite pain and bleeding at the introitus. Based on her description Dr. Gfeller assessed it as a 4 + pain on a scale of 5. She demanded that something be done to alleviate her continuing problem. Dr. Gfeller discussed the possibility of surgery with her, suggesting a reverse perineorrhaphy and partial vulvectomy. The procedure involved a traverse cut in the wall of the vagina sutured in the opposite direction. It was designed to widen the opening. The procedure also involved removing friable tissue from the strictured area of the vulva at the introitus. During that visit, Dr. Gfeller held the first consent conference with the plaintiff. He explained, generally, the risks of the surgery: reaction to anesthesia including death; infection; and hematoma. He also explained that Mrs. CT Page 8428 Weidl could choose not to have surgery and continue to live with her problem.
Mrs. Weidl next contacted the defendants by phone to request that the surgery be performed. On September 24, 1986, a pre-operative examination by Dr. Czaja included a second consent conference. Dr. Czajz again explained the procedure and discussed various risks with Mrs. Weidl. These included: risks of anesthesia, including death; hematoma; infection; and injury to adjacent organs including the anus and colon. Mrs. Weidl agreed to the procedure.
Surgery was performed by Dr. Gfeller on September 30, 1986, at Saint Francis Hospital. In cutting into the perineum, he cut into a cyst in the area of the perineum. Making a medical judgment, Dr. Gfeller removed the cyst. Because the cyst was adherent to the mucosa of the rectum, it was necessary to enter the rectum; and to suture the incision therein.
A post-operative investigation revealed that the rectal suture was not impaired.
The result of the operation was successful in that an admission of three fingers was achieved.
However, sometime subsequent to the operation, it was observed by Dr. Czaja that the anal sphincter was disrupting, after having showed good physical tone after the operation. The plaintiff ultimately consulted a proctologist, Dr. Spear, who performed a procedure to repair the anal sphincter. Thereafter, the plaintiff suffered problems with her bowel movements, and ultimately a fourth procedure was performed at the Lahey Clinic by Dr. Veidenheimer, the chief of colorectal surgery. The plaintiff still complains of problems with her bowel movements.
 I.
Informed Consent
The cause of action based upon a lack of informed consent was first recognized by our Supreme Court in Keenan v. Yale-New Haven Hospital, 167 Conn. 284, 285. In Cross v. Huttenlocher,185 Conn. 390, the court found error in not charging the jury on the failure to warn the plaintiff and her family as to the possible side effects of using a drug he prescribed. Both the standard of care and the breach thereof must be established by expert testimony. P. 393.
Connecticut explicitly recognized the informed consent doctrine in the 1983 case Logan v. Greenwich Hospital Ass'n., CT Page 8429191 Conn. 282 (1983). Therein, the court recognized the doctrine in Connecticut, adopted the so-called lay standard of disclosure and answered affirmatively the specific question on appeal — whether it was error for the trial court to instruct that a viable alternative procedure which is riskier than that proposed need not be disclosed to the patient. Id. The Logan court looked to a trilogy of 1972 cases which set the outline of an informed consent action. See Logan, 191 Conn. 282 (citing Canterbury v. Spence, 464 F.2d 772 (D.C. Cir), cert. denied,409 U.S. 1064 (1972); Cobbs v. Grant, 8 Cal.3d 229, 502 P.2d 1
(1972); Wilkinson v. Vesey, 110 R.I. 606, 295 A.2d 676 (1972)).
The scope of the disclosure required is defined by the "materiality" of potential risks of the procedure and the "viability" of alternate treatments. That is, the physician's disclosure should include: (1) the "nature" of the procedure; (2) the "risks" and "hazards" of the procedure, (3) the "alternatives" to the procedure and (4) the anticipated "benefits" of the procedure." Logan, 191 Conn. at 292 (quoting Meisel Kabnick, "Informed Consent to Medical Treatment: An Analysis of Recent Legislation," 41 U. Pitt. L. Rev. 407, 427 (1980).
"The theory of negligence, . . . has been recognized as being applicable to cases in which it is alleged that the physician failed to obtain an informed consent." Shenefield v. Greenwich Hospital Assn., 10 Conn. App. 239, 248 citing Logan, at p. 289.
 "An informed consent action, however, differs from the ordinary negligence action in that the plaintiff must prove both the duty and the breach of that a duty through expert testimony. Cross v. Huttenlocher, 185 Conn. 390, 393, 440 A.2d 952 (1981). In order to establish the existence of a duty to inform, the plaintiff must show through expert testimony that "the customary standard of care of physicians in the same practice as that of the defendant doctor was to obtain the patient's consent prior to performing any operation." Shenefield v. Greenwich Hospital Assn., supra, 248-49. Once the existence of the duty to inform has been established, the degree or extent of disclosure necessary to satisfy the duty must be proven in accordance with the lay standard. Logan v. Greenwich Hospital Assn., 191 Conn. 282, 292, 465 A.2d 294 (1983)." Mason vs. Walsh, 26 Conn. App. 225, 230.
CT Page 8430 "The essential elements of a cause of action based upon a lack of informed consent is a breach of duty by the defendant and a causal connection between that breach and the harm to the plaintiff." Lambert v. Stovell, 205 Conn. 1, 6.
". . . The standard of medical practice regarding informed consent must be based upon expert testimony, and the jury must find from that expert testimony whether the defendants failed to meet the standard." Hammer v. Mount Sinai Hospital, 25 Conn. App. 702,710.
Such standard of medical practice has been held to apply to the sufficiency of disclosure.
"The accepted view is that the sufficiency of disclosure is a matter to be measured against acceptable medical practice. Plaintiff is required to produce expert testimony to establish a standard of medical practice and show defendant's deviation from that standard."
Llera v. Wisner, ____ Mont. ___, 557 P.2d 805, 810; Green v. Hussey, 127 Ill. App.2d 1714, 262 N.E.2d 156 at 160 and cases cited; McKinney's Consolidated Laws of New York Annotated (Public Health Law 2805-d Subd. 1)
On the issue in Logan, the plaintiff called a urologist, Dr. Roen, who offered an opinion that an alternative procedure should have been discussed with the patient, i.e., an open biopsy as opposed to a needle biopsy, together with disclosure of the risks attending any surgical procedure to be conducted under general, as opposed to local, anesthesia. Logan, at p. 293. Rec. Briefs A-833, Brief and Appendix of Plaintiff — Appellant p. 9.
Defendants' Claims
 A.
As noted supra, the defendants claim that there was no evidence offered by the plaintiff to support her claim as to:
(1) failure to disclose any viable alternative to the procedure;
(2) a finding of causation between such alleged failure to disclose and the plaintiff's claim of injury subsequent to the operation.
 I.
CT Page 8431 In Logan, the court held that "all viable alternatives [must] be disclosed even though some involve more hazard than others," p. 295.
This duty to disclose is said to require a physician to reveal to his patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment. Sard v. Hardy, 281 Md. 432, 379 A.2d 1014, 1021 (1979).
"In disclosing the alternatives, the physician is required to inform the patient as to the nature of treatment, the chances of success and the foreseeable risks." Louisell Williams, Medical Malpractice, 22.03.
"Viable" is defined in Webster's Ninth New Collegiate Dictionary as "having a reasonable chance of succeeding."
"The emphasis here is on what is a reasonable substitute." F. Rotovsky, Consent To Treatment, Sec. 1.12.2 (2d Ed. 1990).
The evidence disclosed that Shirley Weidl suffered from atrophic vulvo-vaginitis and leukoplakia with stricture at the introitus. This meant that not only was her vagina shrunken but also that there was a stricture and friable tissue in the area of her vulva at the introitus. The reverse perineorrhaphy and partial vulvectomy were designed to both widen the vagina and remove the friable tissue which kept breaking down and bleeding on intercourse.
The plaintiff claims that there was an alternative procedure, identified as a hymenotomy by Dr. Leslie, which was less invasive than the proposed procedure, and, that in obtaining the informed consent, the defendants did not disclose the availability of such procedure.
At this point, it should be noted that the only expert testimony as to the standard of care that was offered was that of Dr. Chmieleski. (See. Transcript 3-11-92). He testified as to the risks of the proposed procedure, (p. 16) as well as alternatives (p. 17). At page 14, he testified that a simple hymenotomy would not relieve the plaintiff's complaints. Accordingly, there was no expert testimony as to the deviation from the standard of care.
Therefore, under the rule discussed, the plaintiff has not met the burden of establishing the standard of medical practice as to disclosure, and accordingly, any deviation therefrom. As will be noted infra, Dr. Leslie did not give an opinion (as Dr. CT Page 8432 Roen did in Logan) as to whether the alternative of a hymenotomy should have been disclosed. The following discussion is only addressed to the issue of whether the jury could draw an inference of the standard of disclosure and deviation from such standard, based upon Dr. Leslie's testimony.
In the course of direct examination Dr. Leslie described a hymenotomy.
"Q. And what is a hymenotomy, Doctor?
A. A hymenotomy is again a surgical procedure in the vagina. Basically, you make a longitudinal, a straight incision into the end of the vagina which we call the introitus, and then you make it this way, and then you would sew it up this way; but you would not go into — basically into the perineal area or maybe just the top of it."
Q. Just what is the purpose of a hymenotomy, Doctor?
A. To increase the mouth of the opening into the vagina."
(Transcript, 3-6-92, pp 35-36.)
In response to a question as to whether, in his opinion, the procedure would have addressed the patient's problems, he replied;
"I would think so, yes."
It should first be noted that the witness was not asked whether such opinion was based upon reasonable medical probability. While no "talismanic" words are required to express an opinion, Aspiazu v. Orgera, 205 Conn. 623, 632; "[a]n expert opinion cannot be based on conjecture or surmise, but must be `reasonably probable'." Idem., citing Witkowski v. Goldberg, 115 Conn. 693, 696. In cases such as the one at hand, "the plaintiff cannot prevail in such cases unless there was positive evidence of an expert nature from which the jury could reasonably and logically conclude that the defendant was negligent." Levett v. Elkind, 158 Conn. 567, 574. The answer of the witness left the jury to surmise and conjecture.
Further, there was uncontroverted evidence offered by the plaintiff that the bleeding and pain in intercourse was due to the breaking down of the friable tissue in the perineum. If it may be assumed that the questions assumed all of the facts previously stated by the plaintiff's counsel then the answer posited that the leukoplakia condition would still exist. Since the dryness of the vagina had been already addressed, the CT Page 8433 remaining issue to be addressed was the leukoplakia condition. Although the witness testified that the plaintiff could have used testosterone cream, he offered no opinion as to its effectiveness except to say "it can't do any harm. (T. 3-6-92, p. 122.) He further testified that "if there was a little stricture around the opening there, that might have released that" (T. 3-6-92 p. 123). He also was asked (T. 3-6-92 p. 140),
"Q. Doctor, the condition from which Mrs. Weidl suffered was a competent producing cause of pain when intercourse was had.
A. Yes."
Finally, in the context of the hymenotomy being a less invasive procedure, he testified as follows: (T. 3-6-92 p. 148).
"Well first you try as conservative approaches as you can. If you're getting good results, you continue with the conservative. If you're not getting results, and the patient is or isn't cooperating, depends upon the patient, then you go up another step. Do you want to do — like a hymenotomy procedure or do you think you want to do a reverse perineorrhaphy? It's up to the doctor's decision obviously."
He further testified (T. 3-6-92 p. 150) that there is no guarantee that any surgery is going to be successful.
The sum of the witness' testimony is that the hymenotomy he proposed would not address the leukoplakia condition with stricture, which he admits was causing the painful intercourse after the use of the Premarin. The hymenotomy was a procedure that might work, but there was no guarantee, nor any estimate of probabilities.
Conversely, both defendants and their expert testified that a hymenotomy would do nothing and the only alternative to the proposed procedure likewise was to do nothing.
In considering all of Dr. Leslie's evidence, the jury was left to surmise and conjecture as to whether the hymenotomy was a viable alternative. Conversely, in Logan, the court noted that the plaintiff produced an expert witness, Dr. Roen, who testified that, in that case, an open biopsy was a viable alternative to the needle biopsy utilized, provided the additional risks were disclosed. p. 295.
The plaintiff also urges that conservative treatment by continued use of creams and ointments would be a viable CT Page 8434 alternative. Dr. Leslie testified that the maximum results in treating the vagina with Premarin had been achieved, that Premarin was of no avail to the perineum, and that testosterone might help as a softening agent, and might have released the stricture. Progesterone would only be used with oral Premarin. There was no expert evidence that such uses would achieve any relief.
The court finds that there was no evidence to found any inference to support a finding by the jury that the plaintiff offered any viable alternative to the procedure used.
 II.
The defendants also claim that there was no evidence to support a finding of causation between the alleged failure to disclose and the claims of injury subsequent to the operation.
 "All courts recognizing the doctrine of informed consent require proof of proximate causation. The rule is that a plaintiff cannot recover under the doctrine unless he can prove by preponderance of the evidence that he would not have given his consent to the proposed procedure had full and adequate disclosure been made at the time consent was originally given. Karp v. Cooley, 498 F.2d 408, 422 (5th Cir.), cert. denied, 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1974), Aiken v. Clary, 396 S.W.2d at 676; Wilkinson v. Vesey, 295 A.2d at 690."
Sard v. Hardy, supra, 379 A.2d 1014, 1025.
In Hammer, supra, the Appellate Court adopted the objective test as the standard of proof, i.e., what a reasonable person would have done had he been fully informed.
 "A succinct statement of the objective test was set out in Canterbury v. Spence, 464 F.2d at 791: "Better it is, we believe, to resolve the causality issue on an objective basis; in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not.""
Sard, supra, at page 1026. CT Page 8435
It is the plaintiff's burden, in this instance, not only to prove the failure to disclose a viable alternative; and that such failure constituted a violation of the applicable standard of care, but also that such failure was a proximate cause of the injuries and suffering complained of.
Such causal relationship comes into existence when the disclosure of a viable alternative would have resulted in a decision by the patient to forego the recommended procedure and that the withholding of consent would have been reasonable. The standard is what a reasonable person in the plaintiff's position would have decided, under all the circumstances then pertaining, if she has been informed of such viable alternatives. See Hammer v. Mount Sinai Hospital, 25 Conn. App. 702, 711, n. 6, 712.
As noted supra, the disclosure of the omitted procedure would include the matters set forth in Logan (p. 292), i.e., nature of procedure, risks, chances of success. For example, in Logan, the alternative procedure would have required an incision and be performed under general anesthesia, which in the opinion of the expert entailed a greater risk of complication, p. 285.
As noted supra, the only expert testimony was to the effect that there was no need to disclose the hymenotomy procedure. Even were the jury to find by inference that disclosure was required, the evidence before the jury as to the nature of the alternative was to the effect that the procedure would not cure the stricture which was causing the plaintiff pain — nor, as in Logan, has the plaintiff established any risks associated with the procedure. The plaintiff was demanding that something be done. In the light of the foregoing, the court finds the plaintiff has failed to prove causation, i.e., that a reasonable person, with such disclosure as the plaintiff has offered, would have foregone the procedure proposed. Todd v. U.S. 570 F. Sup. 670; Dessi v. U.S., 489 F. Sup. 722.
The court further finds that the plaintiff has failed to establish causation between the dihisus of the sutures and the damage to the perineum and to the anal sphincter. (T. 3-6-92 pp 148-149.
 B.
As noted supra, the defendants claim that the verdict was against the law, and cite six grounds. The court has ruled on (1), (2) and (6) and will address the remaining:
(3) lack of expert testimony as to who has the obligation CT Page 8436 to obtain informed consent;
(4) the award against both doctors constitute double compensation for the same injury;
(5) since the duty to obtain informed consent is singular, a verdict against the other doctor cannot stand.
 I.
As noted in Mason v. Walsh, supra, p. 230, in a suit based upon failure to obtain informed consent the plaintiff must prove both the duty and breach of that duty through expert testimony. In short, the plaintiff must prove the following:
a. Existence of a duty to inform.
b. Upon whom such duty rested.
c. The degree of disclosure necessary to satisfy such duty.
d. Breach of such duty.
 "In order to establish the existence of a duty to inform, the plaintiff must show through expert testimony that "the customary standard of care of physicians in the same practice as that of the defendant doctor was to obtain the patient's consent prior to performing any operation." Shenefield v. Greenwich Hospital Assn., supra, 248-49. Once the existence of the duty to inform has been established, the degree or extent of disclosure necessary to satisfy the duty must be proven in accordance with the lay standard. Logan v. Greenwich Hospital Assn., 191 Conn. 282, 292, 465 A.2d 294 (1983)." Ibid.
In the instant matter the parties stipulated that such a duty existed. The plaintiff's attorney inquired of Dr. Gfeller:
"Would you agree with me there's a duty on the part of a doctor to inform a patient as to the risks, benefits, complications of a surgery?" The witness replied, "Yes."
As noted supra, the complaint charged each defendant with a breach of the duty to obtain informed consent. The plaintiff offered evidence as to the explanation given by each defendant to the plaintiff as to the nature, risks, benefits and complications of the procedure. However, the evidence was clear CT Page 8437 that the procedure was performed by Dr. Gfeller and the involvement of Dr. Czaja was being aware that the procedure was taking place.
In Mason, supra, the plaintiff consulted a urologist for treatment of an infection caused by a hydrocele. The defendant recommended general anesthesia. The defendant consulted with an anesthesiologist who agreed that general anesthesia was appropriate. After admission to the hospital, the plaintiff met with Dr. Sarwar, an anesthesiologist who reviewed the plaintiff's medical history, evaluated her for candidacy for general anesthesia and noted the result in the plaintiff's hospital chart. On the morning of the surgery, the plaintiff met with another anesthesiologist, Dr. Guinaza, who reviewed the chart, and noted the recommendation for the specific anesthesia recommended by Sarwar. During the operation, atrial fibrillation commenced. The operation was aborted. However, the plaintiff claimed to suffer from an irregular heart beat up to the time of trial. The appellate court reversed a verdict for the plaintiff on the premise that the plaintiff offered no expert testimony showing who had the duty to obtain informed consent.
In the instant case, the sole evidence before the jury was the answer of Dr. Gfeller to the question put to him by the plaintiff's attorney. There was no evidence offered to establish which doctor had the duty to obtain informed consent.
While the general rule is that the duty of obtaining the patient's informed consent rests only on the physician performing a medical procedure on the patient, (70 C.J.S. Physicians and Surgeons, 92), such duty must be established by expert testimony. Mason, supra, p. 230.
In Logan, supra, the plaintiff consulted Dr. Newberg, an internist, following birth of twins. He diagnosed lupus and advised a Krotny biopsy. He explained the procedure as being simple and carried out under a local anesthetic, and described some risks but not others. He referred her to Dr. Bogdan, a urologist. Dr. Bogdan performed the surgery but in so doing punctured the plaintiff's gall bladder. The court noted that while Dr. Newberg discussed the biopsy with the plaintiff, there was no evidence that it was his duty to describe the procedure. The plaintiff's expert testified Dr. Newberg had no obligation to obtain the plaintiff's informed consent, and that those duties rested on the plaintiff, who performed the operation. Dr. Bogdan testified to the same effect. Logan, at p. 305. See Rec. Briefs, A-833, Brief of Defendant Appellee, Marc Newberg, p. 22.
CT Page 8438 "If I am going to be the surgeon, it is my responsibility to give the patient informed consent." See also, testimony of Dr. Roen at p. 23.
In Petriello v. Kalman, supra, Dr. Kalman, the operating surgeon, arrived at the hospital to find his patient already medicated. Nevertheless, he obtained the plaintiff's signature on the informed consent form. In his suit for malpractice and lack of informed consent, the plaintiff claimed a nurse employed by the hospital owed him a duty to obtain the informed consent prior to medication. In affirming a directed verdict for the defendant hospital, the court noted that Dr. Kalman testified that it was his responsibility and his alone to obtain the informed consent, p. 387-388. "Since Kalman shouldered the obligation to obtain his patient's informed consent, the hospital could reasonably have relied upon his judgment . . ." p. 388.
In the instant matter, the plaintiff offered no expert evidence as to who had the duty to obtain the informed consent. It should be noted that the counts in the complaint against the respective defendants alleged two different bases of the duty. As to Dr. Gfeller, it was his duty as the attending surgeon. As to Dr. Czaja, it was his duty because he was aware that Dr. Gfeller was doing the operation.
There was no allegation in the complaint that the defendants were partners, nor that they were agents of the other, nor any other claim of vicarious liability. Accordingly, there was no basis upon which liability could be attributed to Dr. Czaja. Mincey v. Blando, 655 S.W.2d 609, 612. However, since the jury found both defendants liable, it is clear that it "was left to resort to surmise, guess, conjecture, and speculation" as to who had the duty to disclose. Mason, supra, p. 231.
"As a result, the jury could not reasonably and legally have reached a conclusion other than one in the defendant's favor . . . ." Mason, p. 231; or, in this instance, in favor of both defendants.
 II.
Under the verdict, the jury awarded damages of $250,000 against each defendant. The defendants claim that the verdict is defective and should be set aside, citing Ferris v. Hotel Pick Arms, Inc., 147 Conn. 72, 73.
The plaintiff herein sued both defendants. Under the law, at that time, the jury could find either or both liable. The CT Page 8439 jury found both liable, and found the damages due the plaintiff to be $250,000. "A plaintiff may elect to satisfy his damages against any culpable defendant since there is ordinarily no contribution between joint tort feasors." Fox v. Fox, 168 Conn. 592,595.
The verdict is not defective.
 III.
The defendants claim that the duty to obtain informed consent is singular and that only one defendant could be found liable by the jury.
As noted supra; The general rule has been stated as follows:
". . . The duty of obtaining the patient's informed consent rests only on the physician or other health care provider treating or performing a medical procedure on the patient." 70 CJS, Physicians and Surgeons 92.
"The rule is that a physician who prepares to perform a medical or surgical procedure has the obligation to explain that procedure to the patient — not the referring doctor." Llera v. Wisner, supra, 557 P.2d at p. 810. See Logan, supra, p. 304-305; Sard, supra, 379 A.2d at p. 1020; Petriello, supra, p. 385.
In Prooth v. Walsh, 432 N.Y.S.2d 663. 105 Misc.2d 603, the court ruled on the question of which of several participants in a medical operation had the duty to obtain the patient's informed consent. Such ruling came after the close of evidence but prior to submission to the jury.
The plaintiff had sued the hospital, his personal treating physician, (an internist) the chief surgeon, (a private attending cardiac surgeon) his assistant surgeon and a private consulting cardiologist for damages resulting from inter alia lack of informed consent.
The court found the personal treating physician liable. "To the degree that the physician provides such treatment directly, he obviously bears a duty to advise his patients of the risk. Further, if he refers his patient to another physician and retains a degree of participation by way of control, consultation or otherwise, his responsibility continues to properly advise his patients with respect to the treatment to be performed by the referral physician." p. 663. (Emphasis added) CT Page 8440
The court also found the chief surgeon liable for the duty and no other. The court also noted that while some of the participants may have an obligation to disclose as to their parts of the procedure, they have no responsibility for disclosure as to that of another participant.
In the instant case, the claim against Dr. Czaja was that he was aware of the procedure taking place at the hospital. Clearly, this would not bring him within the participation rule, supra.
In Sousa v. Chaset, ___ R.I., ___, 519 A.2d 1132, the plaintiff sued a urologist for failure to obtain informed consent. The defendant was a urologist employed by a professional corporation. He scheduled diagnostic tests for the plaintiff. The patient consented on the assurance of the defendant that no external incision would be made.
Being called away on an emergency, the defendant called the plaintiff to inquire whether he wished to postpone the tests or proceed with another doctor employed by the same corporation. The second physician made a diagnosis, and thereafter performed a surgical procedure; which resulted in numerous complications.
The claim against the defendant was based upon partnership by estoppel. The court directed a verdict in favor of the defendant on the basis that both the defendant and the attending physician were employees of the professional corporation and their liabilities were several.
In the instant case, there was neither a claim, nor evidence of, vicarious liability.
If there were evidence offered by the plaintiff which would bring Dr. Gfeller under the general rule, the claim against Dr. Czaja would fail. Since there was no evidence offered, however, this is speculation. In any event, the court finds no theory upon which Dr. Czaja could be held liable. As noted, supra, the only conclusion that can be reached is that the jury based its decision on liability on conjecture, guess and surmise.
 C.
The final claim of the defendants is that the verdict is excessive because it provides for double recovery for the same injury.
The court finds it does not. See Fox v. Fox, supra.
CT Page 8441 Plaintiff's Claims
At the hearing on the instant motion, the plaintiff claimed that the verdict should be supported by
 (a) the improper disclosure of the procedure in Exhibit A — the hospital consent form.
 (b) failure to disclose the alternatives of the hymenotomy and/or use of creams and ointments.
The first issue to be addressed is whether the description of the procedure as a "perineorrhaphy" was a breach of the duty to disclose. See Logan, p. 292. As noted supra, the plaintiff claims that such designation was a failure to disclose "the `risks' and `hazards' of the procedure", Logan, p. 292, presumably on the theory that there were "risks" or "hazards" in a reverse perineorrhaphy that the patient would not be aware of if she were only told that the procedure was a "perineorrhaphy." In Petriello v. Kalman, 215 Conn. 377, the plaintiff sued her physician, as well as the hospital where the physician performed a surgical procedure. On appeal, the plaintiff claimed that the trial court was in error in directing a verdict for the defendant hospital, having claimed that the hospital had the duty to ensure the plaintiff had signed the hospital's consent form prior to giving her pre-operative medication.
"This contention is unsound however, because it equates the signing of the form with the actuality of informed consent which it is the sole responsibility of the attending physician to obtain" p. 385. The court then restated its scope of disclosure as set forth in Logan. "Significantly, we have never held that informed consent be obtained at any specific time, so long as it is obtained prior to the commencement of the medical treatment under consideration. Further, we have never held that such consent must be given in writing . . ." Ibid. "It (the consent form) would also serve as a measure for reminding independent physicians of their duty to obtain such consent before surgery" p. 386.
In Mason v. Walsh, supra, at page 230, the Appellate Court noted that in an informed consent case, the plaintiff must prove both the duty to obtain such consent and the breach of that duty through expert testimony.
The plaintiff's expert, Dr. Leslie, was disclosed as an expert to provide expert testimony as to the standard of care in the treatment of the plaintiff, but not as to the issue of informed consent. Conversely, the defendants offered the CT Page 8442 testimony of Dr. Chmieleski as to the elements of disclosure which constituted the standard of due care as to informed consent in the procedure in this case (See Transcript, March 11, 1992, p. 12, et seq.). At page 41 of said Transcript, counsel for the plaintiff inquired of the witness as to how the proposed procedure should be described on an informed consent form.
"Q. So it wouldn't be more helpfull to describe it in one word instead of two words, reverse perineorrhaphy?
A. No, I don't think so because the important thing is that the physicians explain what the procedure is that they are going to do. I mean, here's what I'm going to do, and you may draw a diagram whatever. I think that's the part that's really informed consent. I think if you take a lay person and you give them the words reverse perineorrhaphy or perineorrhaphy, neither one means anything to them unless you describe in detail what you're going to do.
Q. I understand."
Plaintiff's counsel also attempted to elicit from the defendant Gfeller whether the hospital consent form was "part and parcel of an informed consent." (Transcript, March 10, 1992, p. 11.) The court sustained an objection to the question and the matter was not pursued.
In short, there was no expert testimony to support the plaintiff's claim that the designation of "perineorrhaphy" on the hospital consent form constituted a breach of the standard of due care as to informed consent.
The plaintiff's claim on this ground is supported by neither the law nor evidence.
The remaining issue is whether the lack of disclosure of the hymenotomy procedure and/or continued use of creams and ointments constituted a failure to disclose a viable alternative and therefore a breach of the standard of the care as to informed consent. These matters have been discussed supra, and warrant no further consideration.
Conclusion
With respect to the instant motion, the court notes that the plaintiff has based her recovery under the lack of informed consent doctrine on (1) the alleged improper description on the consent form and (2) the failure to disclose viable alternatives. The court has found that neither ground can be sustained in either law or fact. CT Page 8443
Conversely, the court has found that the defendants have established the following matters in their motion:
(1) on the evidence, in that there was no evidence to support a finding by the jury that,
 (a) the defendants failed to disclose any viable alternatives to the procedure used.
 (b) there was a causal connection between the claim of injury to the plaintiff subsequent to the operation and failure to disclose a viable alternative;
(2) on the law, in that,
 (a) a reasonable person would not have foregone the operation had she been apprised of the claimed alternative procedures.
 (b) there was no expert testimony that the procedure and treatment not disclosed would have cured the condition for which the treatment was sought and that failure to disclose the alternatives did not meet the standard of care.
 (c) there was no expert testimony as to who had the duty to obtain the informed consent.
 (d) the duty to disclose being singular, a verdict against another doctor cannot stand.
 (e) the plaintiff failed to establish causation by expert testimony.
Accordingly, the defendants' motions are granted. The verdict is set aside and judgment notwithstanding the verdict may enter for both defendants.
Burns, J. CT Page 8444